[877 NYS2d 300]

JOHN MELFI, Individually and as Administrator ad Prosequendum of the Estate of LEONARD MELFI, Deceased, Respondent, v MOUNT SINAI HOSPITAL et al., Appellants, et al., Defendants.

First Department, April 28, 2009

### APPEARANCES OF COUNSEL

*Aaronson, Rappaport, Feinstein & Deutsch, LLP*, New York City (*Steven C. Mandell* of counsel), for Mount Sinai Hospital, appellant.

*Michael A. Cardozo, Corporation Counsel*, New York City (*Victoria Scalzo* and *Stephen J. McGrath* of counsel), for New York City Health and Hospitals Corporation, appellant.

*Tacopina, Seigel & Turano, P.C.*, New York City (*Brian King* of counsel), for respondent.

### OPINION OF THE COURT

CATTERSON, J.

The plaintiff, John Melfi, brings this action for, inter alia, loss of sepulcher after his brother's body was sent to a community college for embalming practice and then for burial in a mass grave in Potter's Field.

On October 28, 2001, playwright Leonard Melfi, best known for his one-act play Birdbath and contributions to the Broadway hit Oh! Calcutta!, collapsed in his room at the Narragansett Hotel, a welfare hotel, on the upper west side of Manhattan. The ambulance call report prepared by EMS personnel contained a preliminary diagnosis of respiratory distress, and identifying information including Mr. Melfi's address, date of birth, and Social Security number. The report also listed his friend Joann Tedesco as next of kin together with her phone number.[1]

Mr. Melfi was fitted with an oxygen mask and taken by ambulance to Mount Sinai Hospital where a staff member in the emergency room prepared a patient registration form containing the identifying information and the contact information for Joann Tedesco. A triage assessment was performed in the emergency room but the record does not show that any treatment was administered. Mr. Melfi was next assessed by attending physician John Joseph Bruns, Jr., M.D., who made a preliminary diagnosis of congestive heart failure and atrial fibrillation.

Subsequently, at trial, Dr. Bruns testified to administering a drug to reduce the heart rate and conceded that additional treatment would typically be administered in light of Mr. Melfi's critical symptoms. However the record does not reflect any additional treatment. Further, although Dr. Bruns testified that

---

1. The record reflects that Mr. Melfi was unmarried and had no children, and that his only surviving family members were a brother (plaintiff) who resided upstate, and a niece who lived outside of the city. At the General Municipal Law § 50-h hearing in this action, John Melfi testified that although he and his brother were close, there were periods when there was no contact between them. These occurred when Leonard Melfi checked himself into rehab clinics without telling anyone, or when he visited writer friends in California.

Mr. Melfi received nursing care, no documentation was generated to that effect either. The only documentation that showed any treatment was a billing sheet indicating that pulse oximetry, catheter placement and an electrocardiogram were performed. Mr. Melfi's condition quickly deteriorated, and, despite the fact that he stopped breathing and became unresponsive, there is nothing in the medical records to indicate that any life-saving treatment was initiated.

Mr. Melfi died at 6:20 P.M. that evening. The death certificate prepared by the hospital included Mr. Melfi's name and age, but omitted any additional identifying information such as his address, Social Security number, and Joann Tedesco's contact information, which had been listed on the EMS report and in the patient registration form. Although Dr. Bruns testified that he made two phone calls in an effort to reach Ms. Tedesco, these attempts are also undocumented in the records.

Mr. Melfi's body remained in Mount Sinai Hospital's morgue for 30 days. On November 21, 2001, a death certificate was filed with the New York City Department of Health. Shortly thereafter a burial permit was issued, and on November 28, 2001, Mr. Melfi's body was transferred to the city morgue at Bellevue Hospital.

The record is silent as to any effort made to identify or locate the next of kin during the period the body was at the city morgue. Mr. Melfi's body was subsequently sent for embalming practice by students of Nassau Community College's Mortuary Science Department before it was finally transferred on December 20, 2001 to the City Cemetery on Hart Island, also known as "Potter's Field."[2] Mr. Melfi's body was interred in a mass grave with 150 unclaimed bodies.

---

**2.** The New York City Department of Correction maintains and operates the City Cemetery, called Potter's Field, on Hart Island, the Bronx, in Long Island Sound. Burials are done with inmate labor. Hart Island was purchased by the City in 1868 and a year later was established as the City's public cemetery for the burial of those persons who died indigent or whose bodies went unclaimed. Hart Island began as a prison camp for Confederate soldiers and was subsequently home to a charity hospital for women, an insane asylum, reformatory, and a jail for prisoners who worked on the Potter's Field burial detail. During World War II, the Navy used the island for disciplinary barracks. In the 1940s, inmates on Hart Island appealed to the warden and offered to build a monument to the unbefriended dead. The 30-foot-high memorial was completed in 1948. On one side is engraved a simple cross; on the other the word "PEACE." The likely origin of the term "Potter's Field" as meaning a public burial place for poor and unknown persons is a passage from the Gospel of St. Matthew (27:3-8): "Then Judas, which had betrayed Him,

*(n. cont'd)*

Two months after Mr. Melfi's burial, on or about February 2, 2002, his niece, Dawn Kosilla, a New York State Trooper, was contacted by the manager of the Narragansett Hotel who informed her of her uncle's death. Ms. Kosilla, who had visited her uncle approximately a week before his death, notified her father, the decedent's brother, John Melfi. The family then contacted Ms. Tedesco who advised them that she had not been informed about Leonard Melfi's death.

John Melfi immediately started making inquiries at Mount Sinai Hospital and the city morgue in an effort to locate his brother's body. After several unsuccessful encounters with employees of the hospital and the morgue, he enlisted the assistance of the local media and shortly thereafter, in mid-February, learned that his brother had been buried in Potter's Field.

John Melfi arranged for the exhumation of the body on April 10, 2002 and had it transported to a Manhattan funeral home where he identified his brother's naked corpse which was visibly scarred with incisions and holes made by the students who had practiced on him. Leonard Melfi was finally laid to rest in the family burial plot in his hometown of Binghamton, New York on April 18, 2002.

On or about May 2, 2002, John Melfi served a notice of claim on the defendants. The notice of claim stated in the entry required for "the time when, the place where, and the manner in which the claim arose" that due to Mount Sinai's negligence and medical malpractice, Mr. Melfi expired at the hospital on October 28, 2001. The notice of claim further stated that "no notification was made to anyone regarding Mr. Melfi's death," and that prior to his burial on December 20, 2001, "his body was illegally embalmment [sic] without the permission of the next of kin."

On October 21, 2002, the plaintiff commenced this action against the city defendants and Mount Sinai asserting causes of action for medical malpractice, wrongful death, loss of sepulcher, fraudulent concealment and punitive damages. Following discovery, defendant New York City Health and Hospitals Corporation, sued here as Bellevue Hospital and Health and Hospitals Corporation (hereinafter referred to as HHC), moved for dismissal of the action as time-barred by the 90-day require-

when he saw that he was condemned, repented himself, and brought again the thirty pieces of silver to the chief priests . . . [a]nd they took counsel, and bought with them the potter's field, to bury strangers in." (Http://www .correctionhistory.org/html/chronicl/nycdoc/html/hart.html.)

ment for service of notice of claim. The defendant Mount Sinai Hospital moved to dismiss the claims for punitive damages and fraudulent concealment. The plaintiff moved for leave to amend his complaint to add claims for negligent and intentional infliction of emotional distress.

By decision and order dated April 30, 2008, the court denied HHC's motion for dismissal. The court reasoned that, "[a]s the defendant's conduct is not immediately apparent to a plaintiff, the time in which to file a notice of claim in such a case should begin to run only when the wrongdoing has been discovered, such as in a medical malpractice case in which a foreign object is discovered in the body of a patient." (19 Misc 3d 1129[A], 2008 NY Slip Op 50940[U], *15.) The court also denied Mount Sinai's motion to dismiss the punitive damages claim; it dismissed the plaintiff's fraudulent concealment claim.

The plaintiff's motion for leave to amend was granted to the extent of permitting him to assert a cause of action for gross negligence in the claim against Mount Sinai and to seek punitive damages in connection therewith; leave to amend was not granted to add claims of negligent and intentional infliction of emotional distress as these were determined by the court to be duplicative of the loss of sepulcher claim. All claims against the New York City Police Department, Department of Correction and Department of Health were dismissed as the court determined that they had no duty to identify Mr. Melfi or locate his next of kin.

For the reasons set forth below, we modify and dismiss the claim for punitive damages on the loss of sepulcher cause of action against Mount Sinai, and affirm Supreme Court's determination to deny dismissal of the action against HHC on the grounds that the notice of claim for loss of sepulcher was untimely filed.

It is well established that the common-law right of sepulcher gives the next of kin the absolute right to the immediate possession of a decedent's body for preservation and burial, and that damages will be awarded against any person who unlawfully interferes with that right or improperly deals with the decedent's body. (*Darcy v Presbyterian Hosp. in City of N.Y.*, 202 NY 259 [1911]; *Estate of Scheuer v City of New York*, 10 AD3d 272, 274-275 [1st Dept 2004], *lv denied* 6 NY3d 708 [2006]; *Booth v Huff*, 273 AD2d 576 [3d Dept 2000]; *Lott v State of New York*, 32 Misc 2d 296, 297 [Ct Cl 1962].)

Actions against HHC are governed by McKinney's Unconsolidated Laws of NY § 7401 (2) (New York City Health and

Hospitals Corporation Act § 20 [2], added by L 1969, ch 1016, § 1, as amended) which, in relevant part, provides that such action may not be commenced

> "unless a notice of intention to commence such action and of the time when and the place where the tort occurred and the injuries or damage, were sustained . . . shall have been filed with a director or officer of the corporation within ninety days after such cause of action shall have accrued."

HHC argues that the motion court erred because the plaintiff's notice was untimely. HHC asserts that the cause of action accrued on December 20, 2001, the day Leonard Melfi's body was sent to the Mortuary Science Department of Nassau Community College, and thus the day of the alleged tortious interference with the plaintiff's right to immediate possession of the body.

■ We reject HHC's argument on the grounds that it fails to recognize the essential nature of the right of sepulcher, a unique cause of action among the torts recognized at common law.

For thousands of years, the right of sepulcher has encompassed a solely emotional injury, a concept that, in general, did not gain currency in New York until the late 1950s. During its evolution in the common law, therefore, claims for the loss of sepulcher have compelled courts to struggle with the legal concepts and theories underpinning the compensable wrong. At this point, the courts have recognized that the right of sepulcher is less a quasi-property right and more the legal right of the surviving next of kin to find "solace and comfort" in the ritual of burial. Consequently, we find that a cause of action does not accrue until interference with the right directly impacts on the "solace and comfort" of the next of kin—that is, until interference causes mental anguish for the next of kin. Further, because the injury is emotional or mental, it is axiomatic that a plaintiff must be aware of the interference giving rise to his/her distress before he/she can actually experience distress.

The right of sepulcher, evoking the mystery and sorrow of death and the hope for an afterlife, has been ritualized since the earliest pre-Christian civilizations. From the Egyptian mummification process to the Roman civil law's imposition of a duty of burial, virtually every faith and society has exhibited a reverence for the dead. (*Pierce v Proprietors of Swan Point Cemetery*, 10 RI 227, 235-236 [1872].) Numerous Biblical references to

burial shaped the Christian belief that proper burial in consecrated ground was essential to resurrection. (*See e.g.* Genesis 50:26 [describing Joseph's burial]; Deuteronomy 34:6 [describing Moses' burial].)

Moschion, a Greek poet from the third century B.C., opined that mankind began to bury the dead to remove all traces of a former savage existence or the cannibalism of the Titans:

> "The earth, once barren, began to be ploughed by yoked oxen, towered cities arose, men built sheltering homes and turned their lives from savage ways to civilized. From this time they made it a law to bury the dead or give unburied bodies their portion of dust, leaving no visible reminder of their former impious feasts." (W.K.C. Guthrie, The Sophists, at 82 [Cambridge Univ. Press 1971]; W.B. Tyrrell and F.S. Brown, Athenian Myths and Institutions, at 81 [Oxford Univ. Press 1991].)

In the Greek tragedy Antigone, Sophocles ascribed the right to bury the dead as given by the gods. Creon, who ascended to the throne of Thebes after Oedipus was expelled for killing his father and marrying his mother, decreed that Polynices, son of the incestuous union between Oedipus and Jocasta, was not to be buried but rather remain above the ground to rot. The blind prophet Teiresias railed against Creon's decision:

> "Know, then, and know it well, that thou shalt see not many winding circuits of the sun, before thou giv'st a quittance for the dead, a corpse by thee begotten; for that thou hast trampled to the ground what stood on high, and foully placed within a charnel-house a living soul. And now thou keep'st from them, the Gods below, the corpse of one unblest, unwept, unhallowed." (8 Harvard Classics, part 6, lines 1223-1231 [P.F. Collier & Son, NY].)

Hugo Grotius, the great jurist of the seventeenth century Dutch Republic, in a commentary about the right of sepulcher, expounded on the ancient sources:

> "Isocrates treating of the war of Theseus against Creon speaks thus:
>
> " 'Who does not know, who has not learned, even in the Dionysiac festivals from the writers of tragedies, what evils befell Adrastus before Thebes, when,

wishing to reinstate the son of Oedipus, his son-in-law, he lost the most of his Argive troops and saw the leaders themselves lying slain; when he himself, disgracefully surviving, could not obtain a truce to bury the dead, he came as a suppliant to Athens, which Theseus then was ruling, and besought Theseus not to count it a trivial matter that such men lay unburied, and not to allow the contemptuous disregard of the ancient custom and ancestral right, which all men have in common, not as if established by man, but ordered by a divine power; and Theseus, when he heard this, without delay sent an embassy to Thebes.'

"Later the same author censured the Thebans because they had put the decrees of their own state above the divine laws. He mentions the same story also elsewhere, in the *Panegyric*, in the *Praise of Helen*, and in the *Plataic Oration*. Herodotus, too, mentions it in his ninth book, Diodorus Siculus in his *Histories*, Book IV, Xenophon in his *Greek History*, Book VI, and Lysias in the oration in honour of the dead; finally, Aristides has the story in his *Panathenaic Oration*, and he says that this war was undertaken on behalf of the common nature of men." (2 On the Law of War and Peace ch 19 [1625].)

The ancient concept that every person is entitled to a proper burial continued through the evolution of English common law and provides the origins of American jurisprudence concerning the right of sepulcher.[3] In seventeenth century England the burial of bodies was performed primarily by churches, which had a duty to bury the bodies of parishioners. The church enforced all the necessary rules for proper sepulture, that is, for the burial and the custody of the buried remains, rendering any individual action in that respect unnecessary. (*See* Ruggles, An Examination of the Law of Burial, in a Report to the Supreme Court of New York [1856].)

Sir Edward Coke was therefore able to state that burial was *"nullius in bonis"* or the "goods of no one." (3 Edward Coke,

---

**3.** Richard Burn, an early English author on the topic of ecclesiastical law, wrote of the right of every parishioner to a Christian burial in the churchyard of his parish. He further explained that this right to burial cannot be denied as a result of debt, clearly indicating the societal concern with timely burial. (Burn, 1 Ecclesiastical Law, at 258-258*b* [7th ed 1809].)

Institutes of the Laws of England, at 203 [1644].) Coke's statement was interpreted by many contemporaries as rejecting a property right in corpses. Unfortunately, this interpretation was imported into Anglo-American law and ultimately led to the conflation of the common-law right of sepulcher with the common-law right of interment or sepulture.

Toward the end of the nineteenth century, when mutilation and theft of cadavers rose in proportion to the increasing needs of medical science, the courts, purportedly constrained by Lord Coke's dictum, often fashioned remedies by, for example, finding a cause of action in trespass. (*See Meagher v Driscoll*, 99 Mass 281 [1868].) In 1891, however, in *Larson v Chase* (47 Minn 307, 50 NW 238 [Sup Ct 1891]), a seminal case that was subsequently relied on by New York courts, the Minnesota Supreme Court attempted to put the dictum in perspective.

In that case, the defendant argued that the plaintiff widow had no legal interest in or right to the body of her deceased husband. The defendant asserted that the mental suffering and nervous shock because of the body's mutilation and dissection were not actionable because they were not dependent upon actual injury to person or property since the body was not property.

The court rejected the ubiquitous "nullius in bonis" phrase, stating that it made sense only in a period in history when *sepulture* and custody of the body remains were within the exclusive jurisdiction of the church and ecclesiastical courts. (47 Minn at 310, 50 NW at 239.) Instead, the court held that "the right to the possession of a dead body for the purposes of decent burial belongs to those most intimately and closely connected with the deceased by domestic ties." (*Id.*) As a consequence, the court observed, "the mere fact that a person has exclusive rights over a body for the purposes of burial leads necessarily to the conclusion that it is his property in the broadest and most general sense of that term." (*Id.*)

Significantly, however, the court shied away from holding that the compensable wrong arose because interference with the right was a form of injury to property. Instead, it characterized the "possessory" right as a legal right with damages recoverable upon the tortious invasion of such legal right. (*Id.*) The court then concluded that "where the wrongful act constitutes an infringement on [*sic*] a legal right, mental suffering may be recovered for, if it is the direct, proximate, and natural result of the wrongful act." (47 Minn at 311, 50 NW at 239-240.) From

there, it was hardly a stretch for the court to hold that emotional injury to next of kin can be presumed in a loss of sepulcher action. (47 Minn at 312, 50 NW at 240 [It "is too plain to admit of argument" that "mental suffering and injury to the feelings would be ordinarily the natural and proximate result of knowledge that the remains of a deceased husband had been mutilated"].)

Over the next few decades, New York courts cited frequently to *Larson* in recognizing the legal right of the next of kin to possess the corpse for preservation and burial. They appeared compelled, however, to restate at every turn Lord Coke's misapplied dictum that no property rights existed in the corpse. (*See Darcy*, 202 NY at 262-263, citing *Larson v Chase* with "approval" [right of sepulcher action cannot be maintained by an executor or administrator of an estate because it is not a property right]; *Hasselbach v Mount Sinai Hosp.*, 173 App Div 89, 92 [1st Dept 1916] ["no property rights, in the ordinary commercial sense, in a dead body, and the damages allowed . . . are never awarded as a recompense for the injury done to the body as a piece of property"]; *Foley v Phelps*, 1 App Div 551, 554-555 [1st Dept 1896].)

The *Foley* court, while holding that the plaintiff widow did not have an action based on a property right for the unauthorized dissection of her husband's corpse, nevertheless found a "*quasi* property" right. To reach this result, the court observed that " 'the burial of the dead is a subject which interests the feelings of mankind to a much greater degree than many matters of actual property.' " (*Foley*, 1 App Div at 555, quoting *Pierce*, 10 RI at 237-238.) A "*quasi* property" right, however, was to be found in the "duty imposed by the universal feelings of mankind to be discharged by some one toward the dead." (*Foley*, 1 App Div at 555 [internal quotation marks omitted].) In *Cohen v Congregation Shearith Israel* (85 App Div 65, 67 [2d Dept 1903]), the court explained that according the next of kin a "*quasi* property" right in the decedent's body was "equitable recognition of the natural sentiment, affection, or reverence which exists for the mortal remains of those we have loved long since and lost awhile" (internal quotation marks and citations omitted).

The *Foley* court, however, had stopped short of agreeing with the finding of the *Larson* court that damages would "allow a recovery for mental suffering and for injury to the feelings." (*Foley*, 1 App Div at 556.) Establishing a "*quasi* property" right, therefore, still left unanswered the issue of what precisely con-

stituted the actionable wrong if a next of kin was deprived of a decedent's body for burial or if the right was interfered with in some other fashion, and thus how damages were to be calculated; but not for long.

In 1911, about four decades before the Court of Appeals recognized in unequivocal terms that "[f]reedom from mental disturbance is now a protected interest" (*Ferrara v Galluchio*, 5 NY2d 16, 21 [1958]), it had recognized compensable emotional injury in right of sepulcher cases. (*See Darcy v Presbyterian Hosp. in City of N.Y.*, 202 NY 259 [1911], *supra.*) In that case, the Court finally looked with "approval" to the rule adopted by the *Larson* court. (*Id.* at 263.) The Court held that even though there was no property right in a body, a mother whose decedent son was subjected to an unauthorized autopsy was entitled to recover "for her wounded feelings and mental distress." (*Id.*)

Subsequently, in 1916, this Court found that for a violation of the right to sepulcher "damages may be recovered for the injury to the feelings and the mental suffering resulting from the unlawful act." (*Hasselbach*, 173 App Div at 91.) In 1917, the Court of Appeals found that the burial of a father's body at sea deprived the next of kin "of the solace of giving the body a decent burial on land." (*Finley v Atlantic Transp. Co. Ltd.*, 220 NY 249, 257 [1917] [damages properly recoverable solely for mental anguish, suffering and nervous shock].) A year later, this Court observed: "next of kin . . . are entitled to such right of possession as a solace and comfort in their time of distress." (*Stahl v William Necker, Inc.*, 184 App Div 85, 90-91 [1st Dept 1918].) The Court concluded: "One who deprives a party thus entitled . . . from the solace and comfort arising from the privilege of such burial . . . is liable in damages for the mental suffering and anguish to the surviving relative by reason of such deprivation." (184 App Div at 91.)

In 1933, the Second Department stated that "damages are recoverable for injury to the feelings and mental suffering resulting directly . . . from the wrongful act of deprivation, although no actual or pecuniary damages be proven." (*Gostkowski v Roman Catholic Church of Sacred Hearts of Jesus & Mary*, 237 App Div 640, 642 [2d Dept 1933], *affd* 262 NY 320 [1933].)

By 1975, the Court of Appeals, in the meantime having squarely addressed the issue of compensable emotional harm, recognized that the mishandling of a corpse was one of two exceptions permitting recovery for emotional harm *alone*. (*Johnson v State of New York*, 37 NY2d 378 [1975].) The Court

observed: "Recovery in these cases has ostensibly been grounded on a violation of the relative's quasi-property right in the body. It has been noted . . . that . . . such a property right is little more than a fiction; in reality the personal feelings of the survivors are being protected." (37 NY2d at 382 [internal quotation marks and citations omitted].)

Courts in other jurisdictions also recognized that a "quasi property" right was a legal fiction to enable recovery of damages for injury to the feelings of the next of kin. (*See* Rao, *Property, Privacy and the Human Body*, 80 BU L Rev 359, 385-386 [2000], citing *Carney v Knollwood Cemetery Assn.*, 33 Ohio App 3d 31, 36, 514 NE2d 430, 435 [1986] [plaintiff brings the action for the mental anguish undergone "from the realization that disrespect and indignities have been heaped upon the body of one who was close to him in life"] and *Culpepper v Pearl St. Bldg., Inc.*, 877 P2d 877, 880 [Colo 1994] [it is not injury to the dead body "but whether the improper actions caused emotional or physical pain or suffering to surviving family members"]; *Keyes v Konkel*, 119 Mich 550, 551, 78 NW 649 [1899] [recovery is for damage to the next of kin by infringement of his right to have the body delivered to him for burial].) The court in *Scarpaci v Milwaukee County* (96 Wis 2d 663, 672, 292 NW2d 816, 820-821 [1980]) explained succinctly:

> "The basis for recovery of damages is found not in a property right in a dead body but in the personal right of the family of the deceased to bury the body
>
> . . .
>
> "The law is not primarily concerned with the extent of physical injury to the bodily remains but with whether there were any improper actions and whether such actions caused emotional or physical suffering to the living kin."

Based on the foregoing analysis, we find HHC's argument that John Melfi's right of sepulcher claim accrued on December 20, 2001 to be without merit. The decedent's brother in this case is not seeking to vindicate any quasi-property right that was interfered with on December 20, 2001 when HHC released Leonard Melfi's body for practice embalming and burial in Potter's Field. John Melfi brings the action against HHC because of the mental anguish he suffered upon the realization that his brother was dead and that the failure to notify the next of kin deprived the family of giving him a proper burial.

Hence, we find that for a right of sepulcher claim to accrue (1) there must be interference with the next of kin's immediate possession of decedent's body *and* (2) the interference has caused mental anguish, which is generally presumed. Interference can arise either by unauthorized autopsy (*Darcy*, 202 NY at 262-263) or by disposing of the remains inadvertently (*Finley*, 220 NY at 257-258; *Correa v Maimonides Med. Ctr.*, 165 Misc 2d 614 [Sup Ct, Kings County 1995]) or, as in this case, by failure to notify the next of kin of the death. The next of kin's mental anguish in these situations is then generally presumed but, in any event, cannot be felt until the next of kin is aware of the interference with his/her right of possession of the loved one's body for burial.

Right of sepulcher cases, then, are not akin to "foreign object" cases, as Supreme Court observed here, where the statute of limitations is tolled rather than accruing at the date of the surgeon's negligent act. In those cases, it is indisputable that actual injury occurs when the foreign object is left inside the body but the statute of limitations is tolled until plaintiff discovers the existence of the foreign object.

Here, because the injury is solely emotional, it is axiomatic that a next of kin cannot be injured emotionally until he or she becomes aware or has knowledge that his or her right of sepulcher has been interfered with unlawfully.

Thus, while HHC is correct that the wrongful act that interfered with possession occurred on December 20, 2001, it did not become an actionable wrong until the plaintiff was, in fact, emotionally injured by the knowledge of that interference in or around February 2002. In other words, sending a corpse to Potter's Field or for practice embalming is not actionable per se; it is not actionable until a claimant next of kin has suffered emotional anguish as a result of the wrongful act.

Contrary to the defendant's assertions, the accrual of claim in right of sepulcher actions belongs in that small body of case law where a claim does not accrue with the negligent act but at the time a plaintiff is *actually* injured by the negligent act. (*See Sexstone v City of Rochester*, 32 AD2d 737 [4th Dept 1969] [90-day period for filing a notice of claim did not run from date of negligent issuance of certificate but from the date the negligent act produced injury to the plaintiffs], citing *Konar v Monro Muffler Shops of Rochester*, 28 AD2d 642 [4th Dept 1967]; *see also Thomas v Grupposo*, 73 Misc 2d 427, 431 [Civ Ct, NY County 1973] [cause of action did not arise on day of negligent

sale but when plaintiff demanded his property and was notified that it was sold]; *see also Distel v County of Ulster*, 107 AD2d 994, 996 [3d Dept 1985] [stating that the 90-day notice requirement under section 50-e of the General Municipal Law began to run when plaintiffs received an affidavit stating that defendant could not locate portions of organs of decedent, affording them sufficient notice to cut off the tolling of the statute].)

As the plaintiff correctly asserts, the cases relied on by HHC are inapposite. *Jensen v City of New York* (288 AD2d 346 [2d Dept 2001]) and *Moore v City of New York* (291 AD2d 386 [2d Dept 2002]) are actions in gross negligence and negligent infliction of emotional distress, not loss of sepulcher cases. Moreover, like the third case, *Cally v New York Hosp. Med. Ctr. of Queens* (14 AD3d 640 [1st Dept 2005]), *Jensen* and *Moore* concern the timeliness of the commencement of the actions and thus speak to the statute of limitations in actions against the City rather than the timeliness of notices of claim.

It may well be that were we determining the timeliness of commencement of a right of sepulcher action, we would disagree with the Second Department and find, like the motion court in this case, that a violation of the right of sepulcher is a continuing wrong, with the statute of limitations tolled until a loved one's body is returned or the next of kin is informed that the body will never be returned. Indeed, we could be swayed by the court's reasoning that a finding other than that of continuing wrong would reward, if not necessarily encourage, a tortfeasor's delay in acknowledging misidentification of remains (*see Jensen*, 288 AD2d at 347) or the inadvertent disposal of remains until the statute of limitations had run. But we need not reach the merits of that issue in this case.

As to a notice of claim, the 90-day clock starts to run upon the accrual of the claim, that is, the moment a wrong becomes actionable. A statute of limitations speaks to the latest point in time that an action for a wrongful act may be commenced. In this case, John Melfi's claim accrued upon the painful realization in February 2002 that his brother's body had been mutilated and buried in a mass grave of unclaimed bodies. Therefore the filing of the notice of claim on May 2, 2002 was timely within the statutorily permissible 90 days.

HHC also appeals the order denying summary judgment as to the loss of sepulcher claim on the basis that it had no statutory duty to locate the next of kin and cannot be held liable for its discretionary delivery of the unclaimed body to Nassau Com-

munity College's Mortuary Science Department where students practiced embalming on the body. Section 4211 (1) of the Public Health Law sets forth the requirements for the delivery of unclaimed cadavers to schools. Specifically, "[n]o body of a deceased person shall be delivered to . . . any university, college, or school . . . if the deceased person is known to have a relative whose place of residence is known or can be ascertained after reasonable and diligent inquiry." (Public Health Law § 4211 [3] [c].)

The motion court correctly concluded that the morgue had a statutory obligation to make appropriate efforts to locate a next of kin and that a question of fact exists as to whether it conducted a "reasonable and diligent inquiry" to locate the next of kin of Leonard Melfi. Given the paucity of evidence that even one person attempted to locate the next of kin during the decedent's sad journey through the city morgue to Potter's Field, it is conceivable that a jury could find that HHC conducted no inquiry at all, much less one that is reasonable and diligent.

Finally, although punitive damages may be awarded in a loss of sepulcher claim, Mount Sinai Hospital argues that punitive damages are not appropriate in this case because the wrongful conduct did not demonstrate such a " 'conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton.' " (*Liberman v Riverside Mem. Chapel*, 225 AD2d 283, 291 [1st Dept 1996], quoting *Prozeralik v Capital Cities Communications*, 82 NY2d 466, 479 [1993], quoting Prosser and Keeton, Torts § 2, at 9-10 [5th ed 1984]; *see also Plunkett v NYU Downtown Hosp.*, 21 AD3d 1022 [2d Dept 2005]; *Liendo v Long Is. Jewish Med. Ctr.*, 273 AD2d 445 [2d Dept 2000].)

The record reflects that the defendant, Mount Sinai Hospital, has extensive protocols in place to make certain that a next of kin is located to claim the body of a deceased patient. The steps taken by every hospital department are required to be documented. The treating physician who pronounces the death is initially responsible for notifying the next of kin. If he is not successful, he informs the nurse manager, who then continues contact efforts by making repeated phone calls, sending a telegram, and contacting the New York City Police Department to request visits to potential addresses of the next of kin. If all of these efforts are unsuccessful, the nurse manager contacts yet another hospital director who conducts her own investiga-

tion before formally requesting a police investigation. Once the body is transferred down to the hospital morgue, there are even more inter- and intra-departmental procedures in place to ascertain a next of kin. Only after every source has been exhausted in attempting to identify a next of kin is the body transferred to the city morgue.

Other than the two phone calls purportedly placed by Dr. Bruns that were not documented, there is nothing in the record to suggest that these precautionary procedures were followed by Mount Sinai in this case. The personnel to whom Dr. Brun may have delegated this duty made no documented attempt to contact a next of kin, nor was the New York City Police Department contacted. Critical identifying information was omitted from the death certificate prepared by the hospital despite the fact that this information was easily obtainable from its own records.

While it is possible to view this conduct as willful and in conscious disregard of others, in order for Mount Sinai to be held vicariously liable for punitive damages arising from the conduct of its employees, it must have "authorized, participated in, consented to or ratified the conduct giving rise to such damages, or deliberately retained the unfit servant" such that it is complicit in that conduct. (*Loughry v Lincoln First Bank*, 67 NY2d 369, 378 [1986]; *1 Mott St., Inc. v Con Edison*, 33 AD3d 531, 532 [1st Dept 2006].) Complicity is evident when "a superior officer in the course of employment orders, participates in, or ratifies outrageous conduct." (*Loughry*, 67 NY2d at 378.) A "superior officer" is one who holds "a high level of general managerial authority in relation to the nature and operation of the employer's business." (67 NY2d at 380.) Dr. Bruns is an assistant professor and attending physician in the emergency department at Mount Sinai. However, even as the highest level administrator in charge of Leonard Melfi's emergency room care, Dr. Bruns cannot be considered someone with a "high level of general managerial authority" over the business of the entire hospital. (*See e.g. 1 Mott St.*, 33 AD3d at 532-533 [holding that a field representative who terminated plaintiff's gas service was not a manager of Consolidated Edison].) Further, it cannot be said that Dr. Bruns and his colleagues' conduct reflects the "corporate culture" or "institutional conscience" as the extensive policies and procedures promulgated by the hospital expressly belie this inference. (*Swersky v Dreyer & Traub*, 219 AD2d 321, 329 [1st Dept 1996].)

However, at this stage in the proceedings we cannot rule, as a matter of law, that the plaintiff has failed to put forth a prima facie case of gross negligence and punitive damages against Mount Sinai concerning medical malpractice. Given the paucity of evidence presented by the hospital in the course of discovery, the plaintiff has at least raised a triable issue of fact in this regard.

Accordingly, the order of the Supreme Court, New York County (Joan B. Carey, J.), entered May 5, 2008, which, to the extent appealed from as limited by the briefs, denied the motion by defendant HHC to dismiss the cause of action for loss of sepulcher and the motion by defendant Mount Sinai to strike plaintiff's demands for punitive damages related to the claims of malpractice and loss of sepulcher, and granted plaintiff's motion to amend the complaint to plead a cause of action for gross negligence and related punitive damages against Mount Sinai in connection with the malpractice claim, should be modified, on the law, Mount Sinai's motion to strike plaintiff's demand for punitive damages in connection with the loss of sepulcher claim granted, and otherwise affirmed, without costs.

ANDRIAS, J.P., SAXE, SWEENY and MOSKOWITZ, JJ., concur.

Order, Supreme Court, New York County, entered May 5, 2008, modified, on the law, defendant Mount Sinai's motion to strike plaintiff's demand for punitive damages in connection with the loss of sepulcher claim granted, and otherwise affirmed, without costs.