*186 OPINION OF THE COURT
Joseph J. Maltese, J.
In these coordinated mass tort actions of first impression, this court is called upon to evaluate the boundaries of civil liability in the procurement of human tissue for processing from decedents, without the consent of the decedents before their death or the consent of their next of kin after death.
This court ordered that 22 of the pending 46 actions coordinated for discovery are certified as “trial ready.” The defendants, RTI Donor Services, Inc., RTI Biologies, Inc., formerly known as Regeneration Technologies, Inc., and Tutogen Medical (United States), Inc., made a motion to dismiss all of the claims by all of the plaintiffs. Those defendants also made four more specific motions to dismiss against selected plaintiffs.
Facts
Defendant Michael Mastromarino, a former dentist, entered into the business of harvesting human tissue, organs and bone for distribution to the defendant tissue processors that redistributed them for use in the health care industry. On March 8, 2002, the defendant, RTI Donor Services, then known as US Allograft Network, Inc., contracted with Mastromarino’s organ and tissue harvesting company, Biomedical Tissue Services, Inc. (BTS) to provide it with human tissue for processing and distribution. Under section 1 of the agreement BTS was responsible to “[s]upply Donor Recoveries (Femurs and Tibias) exclusively to USAN (US Allograft Network) which meet USAN’s Acceptance Criteria . . . and other requirements for quality control and assurance, as provided by USAN.” Pursuant to their agreement, “ ‘Musculoskeletal Donor Recovery’ shall mean hemipelvis, femur, fibula or tibia.” Michael Mastromarino executed the agreement as Michael Mastromarino, “M.D.,” on behalf of BTS and Thomas E. Brewer executed the agreement on behalf of US Allograft Network, Inc.
At the request of RTI’s management, their attorney, Jerome Hoffman’s firm conducted an investigation into Michael Mastromarino’s background. Hoffman’s investigators wrote a report that discovered the following information:
“New Jersey Criminal History: 1) an arrest on July 7, 2000 for possession of controlled dangerous substance and for use or being under the influence of any controlled substance, 2) charged with possession or distribution of a hypodermic syringe or *187 needle, and 3) these charges were resolved by pretrial intervention and fined $1250.00.
“New York Criminal History: Misdemeanor for unlawful use of a police uniform or emblem.
“Dental Licensure: New York state suspended Mastromarino’s license on two separate occasions, and that Mastromarino practiced dentistry while his license was suspended; In New Jersey Mastromarino voluntarily surrendered his license.”
An internal memo demonstrates that RTI began to question its business relationship with Mastromarino. Outside counsel, Jerome Hoffman, Esq., in an email warned RTI management in December 2002 that “[t]he good doctor has been on Santa’s naughty list for quite some time. I would strongly encourage you not to do business with someone that has this kind of resume.”
In a second, separate email dated January 7, 2003, attorney Hoffman once again counseled RTI management that
“[g]iven that the issue is whether it makes good business sense to continue a relationship with someone with a background like Dr. Mastromarino, and not whether the contract has been breached, I suggest that we give him the required 60 days notice under the current contract and not sign a new contract with either BioTissue or Bio Medical.”
But RTI did not give Mastromarino 60 days’ notice of termination as counseled by attorney Hoffman and continued doing business with him and BTS. Rather than cancel the March 8, 2002 contract, on February 11, 2003 Mary Basco, medical director for BTS, and Carrie Hartill, RTI vice-president for quality assurance and regulatory affairs, amended the March 8, 2002 agreement to state:
“Recovery Agency will, for the term of this Agreement, maintain current licensure/registration with applicable State and Federal Agencies, and is either Accredited by the American Association of Tissue Banks (AATB) or meets AATB Standards. Recovery Agency will provide evidence of such upon request.
“RTI reserves the right to audit/inspect the agency no less than once a year.”
On February 1, 2003 BTS and RTI executed a new tissue recovery agreement. The agreement states, “For the purposes of this Agreement ‘Musculoskeletal Donor Recovery’ shall mean *188 hemi-pelvis, femur, fibula, or tibia.” Similar to the agreement between BTS and US Allograft Network, Inc., BTS agreed to “[s]upply Donor Recoveries (Femurs and Tibias) exclusively to RTI which meet RTI’s Acceptance Criteria and other requirement for quality control and assurance, as provided, from time to time, by RTI.” Once again, Mary Basco executed the agreement on behalf of BTS; and Roger Rose, vice-president, executed the agreement on behalf of RTI.
Shortly thereafter the parties executed an amendment to the February 1, 2003 tissue recovery agreement which expanded the scope of the tissue agreement. On April 10, 2003 the parties expanded their agreement as follows: “Recovery Agency [BTS] and RTI wish to amend the purpose of the Agreement by adding Cardiovascular Donor Recovery, meaning heart of valves, saphenous veins, femoral artery & veins en bloc, descending aorta and aortoliliac.”
On June 1, 2004 the parties once again amended the February 1, 2003 agreement. This amendment concerned article I, section 1 which dealt with BTS’s agreement to provide RTI with femurs and tibias exclusively. The amendment reads:
“Article I. (1) shall be amended to read:
“1. Femur, Tibia Humerus, Radius, Ulna and Cardiovascular Recoveries exclusively to RTI which meet RTFs Acceptance Criteria and other requirements for quality control and assurance, as provided from time to time by RTI.”
Shortly after one year from the execution of this tissue agreement the parties executed a new agreement effective on June 29, 2005, which states: “BioMedical and RTI entered into a Tissue Recovery Agreement dated February 1, 2003, and Amendments dated April 10, 2003 and June 1, 2004 which the parties wish to terminate and replace with this Agreement, effective June 29, 2005.”
This agreement was executed by Michael Mastromarino as president/CEO of BTS and Roger W. Rose, executive vice-president of RTI. Unlike the previous agreements between the parties this agreement defined the relationship between the parties as follows: “Nothing herein shall be deemed to create an agency, joint venture or partnership relation between the parties hereto.”
Furthermore, rather than the exclusive agreement to provide tissue that previously existed between the parties, paragraph 2.1 of exhibit A to the agreement provides in pertinent part that *189 BTS shall provide: “Designation of RTI to receive the Right of First Refusal for vascular, cardiovascular and musculoskeletal (except iliac crest) human tissue donations.”
After a criminal investigation that spanned New York, New Jersey and Pennsylvania, it was discovered that Mastromarino and BTS employees were unlawfully harvesting the remains of individuals entrusted to certain funeral homes such as codefendant Chris Aldorasi Funeral Services and others. In addition, records indicate that Mastromarino and BTS provided RTI Donor Services with well over 1,000 donor consent files during their three-year business relationship. The elaborate scheme involved forging consent forms purportedly signed by decedents’ next of kin; the operation involved cutting open the corpses and harvesting tissue, bones and organs and replacing those body parts with materials purchased at local hardware stores, such as PVC pipes and rubber gloves.
The plaintiffs in these civil actions are the next of kin of the decedents whose bodies were cut open to remove tissue, organs, and bones. Mastromarino operated under the name of BTS; he also operated under the name of MCM Tissue Recovery Services. Codefendants Lee Cruceta, who also operated under the business name LMC Tissue Recovery Services, Inc., and Joseph Nicelli were the “cutters” who removed the tissue, organs, and bones from the decedents. The codefendants, RTI Donor Services, a recovery agency, along with RTI Biologies and Tutogen, which are tissue processors, accepted the recovered tissue, organs and bones from the BTS “cutters” to be resold in the medical community.
The actions of “the cutters,” codefendants Michael Mastromarino, Joseph Nicelli, and Lee Cruceta, resulted in criminal convictions against them and those proprietors of funeral homes that aided and abetted in this illegal scheme. At present Mastromarino is in Wende Correctional Facility, a New York State maximum security prison, serving an 18-to-54-year sentence imposed by Justice Albert Tomei of the New York Supreme Court, Kings County, that is running concurrently with a sentence handed down by the Philadelphia Court of Common Pleas. Mastromarino, Nicelli and Cruceta have all defaulted in the civil cases before this court. The funeral homes have answered the complaints and are addressed in separate decisions.
The Causes of Action
The plaintiffs, the next of kin of the decedents, alleged the following causes of action by way of master complaints, which *190 listed the following counts: count I. negligence; count II. negligence against defendant funeral homes; count III. negligence against the tissue processors; count IV negligent infliction of emotional distress; count V intentional and reckless infliction of emotional distress; count VI. intentional and reckless infliction of emotional distress; count VII. intentional and reckless infliction of emotional distress; count VIII. negligent misrepresentation; count IX. violation of the New York Consumer Protection Statute (General Business Law § 349); count X. loss of consortium; count XI. loss of sepulcher against all defendants.
Loss of Sepulcher
The moving tissue processor defendants, RTI Donor Services, Inc., RTI Biologies, Inc., formerly known as Regeneration Technologies, Inc., and Tutogen Medical (United States), Inc., argue that the plaintiffs failed to make out a prima facie case for loss of sepulcher because: (1) the moving defendants did not actively participate in the unlawful interference with the bodies; (2) the plaintiffs failed to show a relationship between the moving defendants and the desecration of their family members’ bodies; and (3) any interference with the plaintiffs’ rights of sepulcher was complete at the time the moving defendants came into contact with their loved ones’ tissues.
As recently as 2006 the Court of Appeals in Colavito v New York Organ Donor Network, Inc. recognized that while New York has permitted causes of action for improper autopsy or mutilation of a corpse, the courts of this state have not diverged from the common-law doctrine that there is no common-law property right in a dead body.[1] While this jurisdiction flatly rejects the existence of any property rights in cases of improper autopsy or mutilation of a corpse, the law has recognized the common-law right of sepulcher. The right of sepulcher permits the next of kin the right to recover for solely emotional damages which may arise as a result of interference with their loved one’s body after death. The cause of action is based in part on the solace and comfort felt by the next of kin in the act of ritual burial.[2]
The Appellate Division, First Department, distilled the history of the right of sepulcher in New York State in its opinion in Melfi v Mount Sinai Hosp. Justice Catterson writing for the First Department found
*191 “that for a right of sepulcher claim to accrue (1) there must be interference with the next of kin’s immediate possession of decedent’s body and (2) the interference has caused mental anguish, which is generally presumed. Interference can arise either by unauthorized autopsy ... or by disposing of the remains inadvertently ... or ... by failure to notify the next of kin of the death. The next of kin’s mental anguish in these situations is then generally presumed but, in any event, cannot be felt until the next of kin is aware of the interference with his/her right of possession of the loved one’s body for burial.”[3]
The Appellate Division, First Department, stated that “the right of sepulcher is less a quasi-property right and more the legal right of the surviving next of kin to find ‘solace and comfort’ in the ritual of burial.”[4] This cause of action exists solely to allow the decedent’s next of kin to recover for any emotional injury that may arise as a result of an interference in the proper burial of the decedent. The second element in a claim for the interference with the right of sepulcher requires that the next of kin experience some sort of mental anguish as a result of the interference. This element is generally presumed. In any event, the defendants have not challenged the existence of mental anguish on the part of any of the plaintiffs.
The moving defendants argue that the next of kin plaintiffs have "not demonstrated that the tissue processor defendants owed them a duty and therefore no cause of action can exist against them. In 2011, the Appellate Division, Second Department, considering the common-law right of sepulcher, stated in Mack v Brown[5] that “[i]n order to recover for such emotional injuries, it must be shown that the injuries were ‘the natural and proximate consequence of some wrongful act or neglect on the part of the one sought to be charged.’ ”[6] Therefore, the defendants must have been in a position to owe the next of kin a duty not to interfere with the burial of their family member’s body. Here, RTI specifically amended the March 8, 2002 agreement to reserve an unlimited right to “audit/inspect” Mastromarino/BTS’s operation “no less than once a year.”
*192 In light of advice received from RTFs attorney, Jerome Hoffman, Esq., prior to the execution of the February 2003 amendment the moving defendants were aware of Mastromarino’s questionable character. While counsel for the defense has vigorously argued that the moving defendants needed actual knowledge of Mastromarino’s propensity to desecrate bodies without proper consent before liability can attach, this court does not agree. Indeed, the research conducted by attorney Hoffman and his private investigators into Mastromarino’s background revealed that he was a person of questionable character as is evidenced in attorney Hoffman’s emails to RTI executives. In particular, Mastromarino’s misdemeanor plea for improper use of police identification speaks to his prior bad acts of being untruthful with authority. While this act does not demonstrate Mastromarino’s propensity for the desecration of the dead, it does speak to his ability to present improper paperwork and authorizations to the defendants.
The case law concerning interference with the right of sepulcher frequently concerns hospital and funeral home defendants. In those cases, it is clear that the alleged defendants owed a duty to the next of kin of the decedents to treat their loved ones’ bodies with respect. This case concerns a relatively new player in the post-mortem handling of corpses — namely the tissue processors who receive the human tissue, organs and bone from the “cutters” who supply it. It has been correctly pointed out by moving defendants’ counsel that the nearly 100-year-old case of Hasselbach v Mount Sinai Hosp. is relevant to the case at bar.[7] In Hasselbach the next of kin brought a lawsuit against a hospital for an unauthorized autopsy. The plaintiff conceded that the autopsy was performed not by the employees, servants or agents, but was “performed [by those] pursuing an independent calling and were not then acting under the direction or instruction of the defendant.” The Appellate Division, First Department, rejected the imposition of a duty on the defendants “to protect [the plaintiffs] husband’s body against a post mortem autopsy by any person whomsoever, and to deliver said body to her in the same condition that it was immediately after death.”[8] But these are not the facts before this court.
Here, the moving tissue processor defendants specifically reserved the right to “audit/inspect” Mastromarino’s operation *193 beginning in 2003. It must also be noted that the June 2005 agreement between the parties did not specifically revoke the March 2002 agreement, which had a five-year term and was the subject of the February 2003 amendment. Therefore, the moving defendants’ duty to audit and inspect Mastromarino and BTS continued until 2007.
In addition, a contractual relationship between the parties makes it clear that BTS was the exclusive provider of certain tissue to the moving defendant RTI Donor Services. Normally, a contract alone is not enough to impute tort liability, ¿specially in favor of third-party beneficiaries of a contract. The Court of Appeals in Espinal v Melville Snow Contrs. held that there are
“three situations in which a party who enters into a contract to render services may be said to have assumed a duty of care — and thus be potentially liable in tort — to third persons: (1) where the contracting party, in failing to exercise reasonable care in the performance of his duties, Taunche[s] a force or instrument of harm’ . . . ; (2) where the plaintiff detrimentally relies on the continued performance of the contracting party’s duties . . . and (3) where the contracting party has entirely displaced the other party’s duty to maintain the premises safely.”[9]
But here, the moving defendants contractually created a duty to monitor the operations of Mastromarino and his company, BTS. While such inspections would normally be within the province of state and federal authorities, the moving defendants placed a burden upon themselves that is beyond that which is normally required in the tissue processing industry.
Contrary to the contentions raised by the moving defendants, this court does not maintain that the Anatomical Gift Act imposes a “duty to investigate or a duty to spot-check.” This court finds that the agreement between the parties, RTI Donor Services and BTS/Mastromarino, gave rise to a duty to audit and inspect in order to be in compliance with the higher standards enunciated by the American Association of Tissue Banks (AATB).
During argument on April 20, 2012 counsel for the defendants confirmed this court’s assumptions regarding the placement of the audit/inspection language into RTI’s contracts. On that day counsel for the defendants stated: “And the reason *194 why it was inserted was so that you could comply with the industry standards, which were AATB standards at the time RTI was trying to get certification from AATB.”[10]
Contrary to defendant’s contention, this court did not believe that the right to audit/inspect was beyond the industry standard. It is this court’s holding that the guidelines of the AATB are greater than those required by state or federal statute and the corresponding state and federal regulations as memorialized in the contractual amendments between the parties. Indeed, the AATB website, in its “About Us” section states in pertinent part:
“The Association was founded in 1976 by a group of doctors and scientists who had started in 1949 our nation’s first tissue bank, the United States Navy Tissue Bank. Recognizing the increasing use of human tissue for transplant, these individuals saw the need for a national organization to develop standards, promote ethics and increase donations.
“Since its beginning, the AATB has been dedicated to improving and saving lives by promoting the safety, quality and availability of donated human tissue. To fulfill that mission, the AATB publishes standards and accredits tissue banks. It certifies personnel and operates a tissue network. The association also interacts with regulatory agencies and conducts educational meetings.
“First published in 1984 and presently in its 12th edition, the AATB’s Standards for Tissue Banking are recognized in both the United States and around the world as the definitive guide for tissue banking. These Standards are the only private tissue-banking standards published in the United States, and they are the most comprehensive and detailed tissue-banking standards in the world. As such, the AATB’s Standards have served as the model for federal and state regulations as well as several international directives and standards. Currently, the statutes and/or regulations of more than 20 states reference AATB’s Standards, institutional accreditation, or individual certification. At least six states require AATB accreditation for any tissue *195 bank operating in their state.”[11]
It is also important to note that the AATB’s Code of Ethics states that all members of the organization pledge to adhere to the following:
“We cooperate with [other organizations] to assure a coordinated approach in seeking [consent for donation] . . .
“We act with the highest level of integrity and commit to fair, just, equitable, and legal standards of behavior in all relations with donor families, transplant recipients, other members of the Association, and the global community . . .
“To maintain public confidence in tissue banking, we assure that our relationships with healthcare professionals and our business partnerships are structured to reflect these values and the altruism on which donation is founded.”[12]
It is apparent to this court that the RTI defendants used membership in the AATB as an avenue to enhance its reputation in the human tissue marketplace. Consequently, it sought the AATB certification and imprimatur to raise its operation above the bare bones statutory standards to meet the lofty standards and goals of the AATB.
It is not argued that New York State adopted the AATB standards into its statutes. However, it is a basic premise of contract law that parties may voluntarily hold themselves out to a higher standard than those required of them by law. Such is the case here. Similarly, contractual terms are given their plain meaning absent a definition specifically crafted between the parties. Here the plain language of the contract amendments reserving the right to “audit/inspeet” make no reference to the AATB standards. However, RTFs witness, Caroline Hartill, testified that
“[during] the first quarter of 2003 RTI was undergoing an inspection by the AATB as part of our accreditation maintenance for AATB, and the AATB inspector requested that all of our recovery agency contracts, with all of our recovery agencies, be amended to have more specificity with regards to compliance with AATB standards. She felt that the *196 statements regarding standards and laws in our existing contracts were not sufficiently specific with regard to AATB standards. So we created an addendum for all of the existing agencies, sent them out, and had them returned by fax within the next day or so as part of our accreditation so that we can provide, you know, we amended the contracts to meet that requirement, and as part of that process, Mary Basco signed on behalf of BTS and I signed on behalf of RTI. I signed all of them for all of the recovery agencies on behalf of RTI because it was quality-related requirements and Mary Basco signed on behalf of BTS.
“Q. Who created these addendums to the contract?
“A. It would either have been our contract administrator or outside counsel. I’m not exactly sure. I made the request to our contract administrator internally. She may or may not have reached out to outside counsel to have it drafted.”[13]
Assuming that this court were to accept that the contract between Mastromarino/BTS and RTI should be given the definition of “audit” as provided in the AATB’s Standards for Tissue Banking, 10th Edition, “audit” would be defined as follows: “A documented review of procedures, records, personnel functions, equipment, materials, facilities, and/or vendors to evaluate adherence to the written SOPM, Standards, or federal, state and/or local laws and regulations.”
This definition is contrasted with the plain English definition of “audit” which is:
“1 a : a formal examination of an organization’s or individual’s accounts or financial situation b : the final report of an audit
“2 : a methodical examination and review.”[14]
Indeed, unlike the contractual term “audit” neither the contract, nor the AATB defined the term “inspect,” which is defined as follows,
“1 : to view closely in critical appraisal: look over
“2 : to examine officially.”[15]
The language of the AATB Standards does require that written agreements/contracts exist between tissue banks and all *197 other organizations that perform work on behalf of the tissue banks.[16] Indeed, the relevant portion of the AATB Standards states:
“A tissue bank that has any of its activities or services performed by another entity will be inspected and accredited only for the specific activity (ies) or services (s) that the tissue bank itself performs. However, the tissue bank is responsible for certifying biennially, on a form to be provided by AATB, that the activities or services (s) performed by others has/have been performed in conformance with the Standards. This requirement does not apply to any other AATB-accredited entity. Nor does it apply to any laboratory entity that is certified by [a] recognized standards-setting organization, or has been inspected and found to be operating within acceptable limits by a cognizant government agency.
“Documentation that an audit specific for the services performed for the distributor shall be maintained by the tissue bank (distributor). Such documentation shall itemize all operational systems that were audited to determine compliance with these Standards and shall be provided to AATB on-site inspectors upon request.”[17]
Here the contractual amendments fail to make reference to any amorphous “industry standard” as a definition for “audit/ inspect.” This court is hard-pressed to apply any definition to “audit” or “inspect” beyond that of the word’s plain English meaning, absent an alternative meaning defined in the contractual amendments. Indeed it has not been argued that any such definition of the terms “audit/inspect” was agreed upon by the contracting parties.
As the RTI defendants’ counsel pointed out during oral argument on April 20, 2012 it is the holding of this court that those entities that hold themselves out as AATB certified nullify the absolute shielding effect of the Public Health Law safe harbors which were in effect at the time of the alleged misconduct by Mastromarino. There is no statutory or regulatory provision in New York which requires a tissue bank to conduct any audit or inspection of the tissue recovery agencies engaged by it. In New York a “tissue bank” is defined as: “any person or facility which *198 solicits, retrieves, performs donor selection and/or testing, preserves, transports, allocates, distributes, acquires, processes, stores or arranges for the storage of human tissues for transplantation, transfer, therapy, artificial insemination or implantation, including autogeneic procedures.”[18]
Consequently, in the context of New York regulations both the RTI tissue processing operation and Mastromarino/BTS organ harvesting would be considered tissue banks. Apart from 10 NYCRR 52-3.5 (a) (8) which requires a tissue bank director to establish and maintain planned and periodic internal reviews, there is no requirement for one tissue bank to review the operations of another tissue bank with which it has business dealings.
Similarly, federal regulations do not require one tissue bank or other form of tissue establishment to “audit/inspect” another tissue bank or other tissue establishment. Pursuant to 21 CFR 1270.41 a covered establishment is required to permit the U.S. Food and Drug Administration to inspect its operation. The regulation states in pertinent part that
“[a]n establishment covered by these regulations in this part, including any location performing contract services, shall permit an authorized inspector of the Food and Drug Administration (FDA) to make at any reasonable time and in a reasonable manner such inspection of the establishment, its facilities, equipment, processes, products, and records as may be necessary to determine compliance with the provisions of this part. Such inspections may be made with or without notice and will ordinarily be made during regular business hours.”[19]
In light of the contractual language which “reserves the right to audit/inspect the agency no less than once a year” the RTI defendants may not now come into court and argue that Public Health Law § 4301 (5) (a), which requires “actual notice of contrary indication by the decedent,” is a shield to protect them as a matter of law from the claims of these coordinated plaintiffs. Consequently, it makes no difference that the plaintiffs have stated on the record that the RTI defendants had no actual notice of Mastromarino’s wrongdoing.
Here, the RTI defendants chose to make these contractual amendments even though Mastromarino and BTS were subject *199 to inspection by the FDA and New York State Department of Health, which would have satisfied the requirements set forth in AATB Standards for Tissue Banking § B1.520.
The RTI defendants argue that Mastromarino and BTS were independent contractors of RTI Donor Services. RTI maintains that the contractual language reserving a right to “audit/ inspect” was merely general supervisory powers. The main thrust of defendants’ argument is that the RTI defendants must have actually exercised supervision or control over the work performed by Mastromarino for liability to attach.[20] Here, the testimony of Mr. Plew, an RTI employee, states unequivocally that he was sent to help Mastromarino and BTS become compliant with federal and state regulations, as well as AATB guidelines. Based on this court’s evaluation of the controlling regulations, it appears as if RTI had no duty to ensure Mastromarino/BTS’s compliance with any regulation absent its contractual obligation and membership in the AATB. It is therefore a question of fact as to whether that level of control constitutes general supervisory control or something greater.[21]
Equally unavailing are the plaintiffs’ arguments that the RTI defendants owed the plaintiffs a duty at common law which existed ab initio. The plaintiffs argue that the deposition testimony given by Michael A. Plew demonstrates that a contract was not necessary to audit and inspect Mastromarino’s tissue harvesting operations. During this deposition, Mr. Plew stated that his title at RTI was “senior manager” and that he was not at the executive level. Mr. Plew acted as the number two person in the quality control area which oversaw labs providing human tissue to RTI. Throughout his deposition Mr. Plew stated that he audited those labs to ensure the labs were in compliance not just with federal and state statutes and regulations, but also AATB guidelines. As has been previously stated, AATB certification carries with it requirements that may exceed those required in statutes or regulations.
The plaintiffs failed to cite any case law or statute which would require the application of a common-law duty to this action. In New York, right of sepulcher cases are a subset of negligence actions. In fact, when considering this specific cause of action the editors of the New York Practice Series — New York *200 Law of Torts placed this cause of action in a section entitled “Duty not to inflict emotional distress — Special circumstances and special duty cases.”[22] In discussing these special torts the editors of the treatise write:
“This narrow category of cases that requires no physical harm, no fear of harm, and no zone of danger has generally involved cases in which a defendant with a direct relationship and duty to the plaintiff negligently gives a false report of death of a family member or serious illness of the plaintiff, withholds or mutilates the remains of a loved one, thereby preventing a proper and timely burial, breaches a medical duty of care to the plaintiff-patient directly requiring the patient to make an extremely emotionally distressing decision against his or her morals, violates a statute that sets forth a duty owed directly to the plaintiff, or breaches a medical duty of care to the patient exposing him or her to a traumatic experience involving plaintiffs own body.”[23]
Here, it is conceded by both the plaintiffs and defendants that the legislature has crafted an intricate series of laws to regulate human tissue collection and distribution. Indeed even a private association, the AATB, exists to set forth standards to its membership to engage in the procurement and distribution of human tissue. Consequently, a common-law duty to audit or inspect their suppliers apparently does not exist.
In this case the defendant tissue processors in seeking AATB certification obviated any per se safe harbor that New York State law may have provided. While the operative New York statute at the time of these incidents required “actual knowledge,” the facts elicited in this matter raise a triable issue of fact of whether the defendants had, through their own internal investigations, constructive knowledge that Mastromarino ’ s character was questionable enough to cease doing business with him. This, coupled with the escalating volume of tissue samples provided to RTI in a short period of time, should have triggered a further investigation as to the sources of such tissue by RTI.
Consequently, the contractual relationship between Mastromarino/BTS and RTI created a duty to audit and inspect *201 their operations to comply with AATB requirements for the benefit of their donors and the decedent’s next of kin, who are the plaintiffs in these coordinated actions. Whether that contractual duty was breached remains a question of fact to be determined by a jury.
New York Anatomical Gift Act, Public Health Law § 4306
The Anatomical Gift Act good faith exception from liability codified in Public Health Law § 4306 (3) states that “[a] person who acts in good faith in accord with the terms of this article or with the anatomical gift laws of another state is not liable for damages in any civil action or subject to prosecution in any criminal proceeding for his act.”
As recently as February 23, 2012, the Appellate Division, First Department, in Nunez v New York Organ Donor Network, Inc. held that whether a defendant is entitled to the benefit of the good faith exception is one of fact. In reversing the trial court the Appellate Division, First Department, found that “[t]he evidence here presents no issue of fact whether defendant failed to act in good faith in connection with its efforts to obtain the necessary statutory consent for the subject organ donation.”[24] Here, the February 11, 2003 amendment to the March 8, 2002 agreement provides that “RTI reserves the right to audit/inspect the agency no less than once a year.” By creating a contractual duty to “audit/inspect” Mastromarino and BTS, the moving defendants cannot now assert that they are entitled to the benefit of the good faith provision of the Anatomical Gift Act. At the very least, this creates an issue of fact as to what measures, if any, were taken to audit or inspect their suppliers’ operations and what, if anything, they did in spot-checking the voluminous sets of documents they were provided.
Therefore, the plaintiffs’ master complaint has set forth a prima facie case for interference with the right of sepulcher. The moving defendants’ motion for summary judgment dismissing the plaintiffs’ cause of action for loss of sepulcher is denied.
While this court finds that the defendants owed the plaintiffs in these coordinated actions a duty not to interfere with the remains of their deceased family members, they move in the alternative to dismiss those claims that are duplicative of the plaintiffs’ interference with the right of sepulcher claims. The Appellate Division, First Department, citing the Court of *202 Appeals decision in Murphy v American Home Prods. Corp.[25] held that “a cause of action for infliction of emotional distress is not allowed if essentially duplicative of tort or contract causes of action.”[26] Here, the outrageous conduct complained of by the plaintiffs is an essential element of a claim for interference with the right of sepulcher.[27] Furthermore, each tort seeks duplicative recovery for psychological injuries.
Accordingly, this court finds that the plaintiffs’ claims for negligence (counts I, II, III and VIII), negligent infliction of emotional distress (count IV), and intentional and reckless infliction of emotional distress (counts V, VI and VII) are duplicative to the loss of sepulcher claims and thereby dismisses those claims. Tutogen Medical was not a party to the contract and is hereby dismissed as to all counts.

. 8 NY3d 43, 52-53 (2006).

. Melfi v Mount Sinai Hosp., 64 AD3d 26, 32 (1st Dept 2009).

. Id. at 39 (emphasis omitted).

. Id. at 32.

. 82 AD3d 133 (2d Dept 2011).

. Id. at 138 (citations omitted).

. 173 App Div 89 (1st Dept 1916).

. Id. at 91.

. 98 NY2d 136, 140 (2002).

. Apr. 20, 2012 tr at 10-11.

. History and Background, http://www.aatb.org/About-AATB (accessed July 20, 2012).

. Http://www.aatb.org/aatb/files/ccLibraryFiles/Filename/000000000627/ AATBCodeofEthicsl9June2012.pdf at 1, 2 (accessed July 24, 2012).

. Hartill deposition tr at 81-82.

. Webster’s Collegiate Dictionary (11th ed).

. Id.

. American Association of Tissue Banks, Standards for Tissue Banking § B1.510 (10th ed).

. Id. at § B1.520.

. 10 NYCRR 52-1.1 (aa) (1).

. 21 CFR 1270.41 (a).

. See Capolino v Judlau Contr., Inc., 46 AD3d 733 (2d Dept 2007); Peay v New York City School Constr. Auth., 35 AD3d 566 (2d Dept 2006); Goodwin v Comcast Corp., 42 AD3d 322 (1st Dept 2007).

. See Malamood v Kiamesha Concord, 210 AD2d 26 (1st Dept 1994).

. Lee S. Kreindler et al., New York Law of Torts § 6:28 (14 West’s NY Prac Series).

. Id.

. 92 AD3d 594, 594 (1st Dept 2012).

. 58 NY2d 293 (1983).

. Wolkstein v Morgenstern, 275 AD2d 635, 637 (1st Dept 2000).

. See generally Melfi v Mount Sinai Hosp., 64 AD3d 26 (2009).