[908 NYS2d 425]

Andre Shipley et al., Respondents, et al., Plaintiff, v City of New York et al., Appellants.

Second Department, September 28, 2010

### APPEARANCES OF COUNSEL

*Michael A. Cardozo, Corporation Counsel*, New York City (*Leonard Koerner* and *Ronald E. Sternberg* of counsel), for appellants.

*Ameduri, Galante & Friscia, LLP*, Staten Island (*Marvin Ben-Aron* of counsel), for respondents.

### OPINION OF THE COURT

MASTRO, J.P.

In the present controversy, we are called upon to determine whether the conduct of the defendant Office of the New York City Medical Examiner (hereinafter the Medical Examiner's Office) in releasing the decedent's body to his family for burial following an autopsy, without advising the family members that the decedent's brain had been removed and was being retained for further examination, and without affording them an opportunity to delay the burial of the decedent's remains until such time as the brain could be returned to them, gives rise to a cause of action to recover damages for a violation of the right of sepulcher. Under the circumstances of this case, we conclude that it does.

On January 9, 2005, 17-year-old high school student Jesse Shipley (hereinafter Jesse) was tragically killed in an automobile accident in Staten Island. On January 10, 2005 an autopsy was performed on Jesse's body with the consent of his father, the plaintiff Andre Shipley. The autopsy was performed in the Richmond County Mortuary by Acting Deputy Chief Medical Examiner Dr. Stephen de Roux of the Medical Examiner's Office, for the purpose of determining the cause of Jesse's death.

According to Andre Shipley, he asked Dr. de Roux to make the autopsy "nice and clean because I wanted the boy to look good for his funeral and stuff." On the same date, and following the completion of the autopsy procedure, funeral home personnel picked up Jesse's body from the mortuary, and a wake and a funeral service were held, with Jesse's remains thereafter being buried in a Roman Catholic cemetery on January 13, 2005. Unbeknownst to Jesse's family, although Dr. de Roux had already concluded that Jesse's death had resulted from multiple blunt impacts to the head during the accident which produced skull fractures and brain hemorrhages, Jesse's brain was not returned with the body. Rather, it had been removed at the time of the autopsy and, according to the autopsy report signed by Dr. de Roux on May 16, 2005, it was "fixed in formalin for [subsequent] neuropathologic examination and reporting."

In early March 2005, approximately two months after Jesse's funeral and more than two months before Dr. de Roux signed the autopsy report, a group of forensic science students from the high school which Jesse had attended was on a field trip at the Richmond County Mortuary. During their tour of the facility, the students entered a room in which there was, among other things, a cabinet containing various human organs in specimen jars. Some members of the group observed that one of the jars held a human brain in a formaldehyde solution. In what can only be described as a surreal coincidence, the label on the jar indicated that the brain was that of Jesse Shipley, a circumstance which evoked strong emotional reactions from some of the students who were present. Word of the incident quickly spread at the school, and Jesse's younger sister, Shannon, who also attended the school and who had been injured in the same accident which took the life of her brother, thus became aware that Jesse's brain had been retained by the Medical Examiner's Office. Shannon, in turn, apprised her family. A day or two after the class trip, on March 9, 2005, Dr. Jennifer Schott and Dr. Hernando Mena of the Medical Examiner's Office dissected and examined Jesse's brain, later issuing a neuropathology report confirming the findings that had been made by Dr. de Roux some two months earlier. When subsequently asked about the reason for the two-month interval between the autopsy and the examination of Jesse's brain, Dr. de Roux explained, "I wait months, until I have six brains, and then it's kind of worth [Dr. Mena's] while to make the trip to Staten Island to examine six brains. It doesn't make sense for him to come and do one."

After confirming that Jesse's brain was still present in the mortuary, and consulting counsel with regard to their rights, Jesse's parents obtained a temporary restraining order on March 17, 2005, preventing the City of New York and the Medical Examiner's Office from further modifying or altering any of Jesse's bodily material. It is undisputed that Jesse's remaining body parts subsequently were returned to his family. In addition, the family received a copy of the autopsy report on May 31, 2005. On March 31, 2006 Jesse's parents, Andre Shipley and Korisha Shipley (hereinafter together the plaintiffs), and sister Shannon Shipley (hereinafter collectively the Shipleys), commenced this action against the defendants City of New York and the Medical Examiner's Office, seeking to recover damages for the emotional injuries they suffered as a result of the alleged mishandling of and interference with the proper disposition of Jesse's remains. Among the allegations contained in the complaint were that Jesse's brain improperly had been put on display at the mortuary without authorization, and that the undisclosed withholding of the brain had necessitated a second funeral: "The Shipleys were informed by their priest, that their son's burial was not proper without the remaining body parts. Because of this, the Shipley[s] had to go through another anguishing funeral service for their son."

Following joinder of issue and extensive pretrial discovery, including the depositions of the parties and of certain nonparty witnesses, the defendants moved for summary judgment dismissing the complaint on various grounds, including that it failed to state a cause of action for violation of the right of sepulcher. The Supreme Court granted the motion with respect to the cause of action asserted by the infant plaintiff Shannon Shipley on the ground that she lacked capacity to sue because she did not qualify as "next of kin" as that term was defined in the New York City Health Code (24 RCNY former 205.01 [d] [5]). However, the Supreme Court denied the motion with respect to the plaintiffs. The Supreme Court found that questions of fact existed with regard to whether Jesse's brain had been lawfully retained for scientific purposes, and whether the defendants unlawfully interfered with the plaintiffs' right of sepulcher by failing to advise them at the time the body was released for burial that the brain had been removed and retained, thereby necessitating a second funeral when the true facts were discovered and the brain was returned. Since we agree with the latter observation of the Supreme Court, we now modify the order.

On this appeal, the defendants essentially contend that the common-law right of sepulcher cannot infringe upon the expansive authority of the Medical Examiner's Office to discharge its duties in the exercise of its professional discretion. The powers of the Medical Examiner's Office are indeed fairly broad. A medical examiner or coroner has the statutory authority to perform autopsies under certain specified circumstances (*see* Public Health Law § 4210) including, inter alia, situations suggesting that death occurred by criminal violence, by accident, by suicide, suddenly when in apparent health, when unattended by a physician, or in any suspicious or unusual manner (*see* NY City Charter § 557 [f] [1]), as well as when consent to an autopsy has been given by the appropriate next of kin (*see* Public Health Law § 4210 [3]). New York City's Chief Medical Examiner and his or her designees also are expressly authorized to conduct forensic testing, to perform pathology, histology, and toxicology testing, and to determine the cause of injuries and/or death, and they are further required to notify the appropriate district attorney when, in the judgment of the particular medical examiner, criminality is indicated (*see* NY City Charter § 557 [f] [3]; [g]). In addition, while a medical examiner may certify a cause of death without an autopsy where it can be concluded with reasonable certainty that death resulted from natural causes or traumatic injury, an autopsy nevertheless may be performed where the medical examiner determines, in his opinion, that it is necessary, and said autopsy may include toxicologic, histologic, serologic, and microbiologic examination (*see* Administrative Code of City of NY § 17-203). The authority to perform such tests necessarily includes, by implication, the authority to remove organs, tissue samples, and bodily fluids for that purpose.

In view of the foregoing, it cannot be suggested in this case that the autopsy of Jesse Shipley was unauthorized. Rather, the evidence demonstrates that Jesse's father consented to the procedure (*see* Public Health Law § 4210 [3]) and, even in the absence of such consent, an autopsy was authorized in the discretion of Dr. de Roux because Jesse's death appeared to occur as the result of an accident (*see* NY City Charter § 557 [f] [1]). In this regard, and contrary to the plaintiffs' contentions, we note that even though traumatic injury was the apparent, and perhaps obvious, cause of Jesse's death, it was still within Dr. de Roux's discretion, in the exercise of his professional judgment, to perform the autopsy (*see* Administrative Code § 17-

203). The defendants are immune from liability for that discretionary determination, even if it was negligently made, since "[g]overnment action, if discretionary, may not be a basis for liability" (*McLean·v City of New York*, 12 NY3d 194, 203 [2009]; *see Lauer v City of New York*, 95 NY2d 95, 99 [2000]). Likewise, the discretionary decision of Dr. de Roux to remove and retain Jesse's brain for further neuropathologic examination, an unquestionably legitimate and legally authorized procedure during an autopsy, is also immune from suit in the same manner as the testing of other tissue samples and bodily fluids would be. Indeed, even the retention of Jesse's brain for a period of some two months before it was examined, based upon the apparent administrative convenience of the Medical Examiner's Office, may be insulated from legal liability based upon a similar analysis of the discretionary allocation of resources within that office, although we need not definitively resolve that question on this appeal because the plaintiffs have not advanced it as a distinct theory of liability in this case.

The above discussion demonstrates that the statutory powers and discretionary authority of the Medical Examiner's Office are extensive. However, they are not unlimited. Rather, "[t]he authority to perform an autopsy derives solely from statute" (*Hendriksen v Roosevelt Hosp.*, 297 F Supp 1142, 1144 [1969]), and "Public Health Law article 42, which governs the disposition and autopsy of cadavers, reflects [the] concerns for respecting the corporeal remains of decedents and protecting the feelings of family members by strictly limiting the circumstances under which autopsies may be performed" (*Bambrick v Booth Mem. Med. Ctr.*, 190 AD2d 646, 647 [1993]). In consonance with the foregoing, Public Health Law § 4215 (1) provides for the burial or other appropriate disposition of a deceased person's remains after the legitimate purposes of an autopsy have been satisfied, and it safeguards the rights of the next of kin to receive those remains for burial:

> "In all cases in which a dissection has been made, the provisions of this article, requiring the burial or other lawful disposition of a body of a deceased person, and the provisions of law providing for the punishment of interference with or injuries to it, apply equally to the remains of the body after dissection as soon as the lawful purposes of such dissection have been accomplished."

Significantly, the statute draws no distinction between the

return and burial of the body itself and of organs which may have been removed from it for further testing—both are remains which are to be properly disposed of once the examination has been completed. In this case, proper disposition consisted of the return of all of the remains to Jesse's next of kin. Indeed, the statute at least implicitly acknowledges the next of kin's right of sepulcher by referencing the prohibition against interfering with the burial of a decedent's remains.

New York's jurisprudence has long recognized the interest of a decedent's next of kin in the remains of their decedent, and infringement upon that interest repeatedly has been acknowledged to be actionable (*see Johnson v State of New York*, 37 NY2d 378, 382 [1975]; *Darcy v Presbyterian Hosp. in City of N.Y.*, 202 NY 259, 262-265 [1911]; *Wainwright v New York City Health & Hosps. Corp.*, 61 AD3d 851, 852 [2009]; *Estate of LaMore v Sumner*, 46 AD3d 1262, 1264 [2007]; *Prescott v Turner*, 15 AD3d 557, 558 [2005]). As frequently formulated in case law, "the common-law right of sepulcher gives the next of kin the absolute right to the immediate possession of a decedent's body for preservation and burial, and . . . damages will be awarded against any person who unlawfully interferes with that right or improperly deals with the decedent's body" (*Melfi v Mount Sinai Hosp.*, 64 AD3d 26, 31 [2009]; *see Darcy v Presbyterian Hosp.*, 202 NY at 262; *Nesbit v Turner*, 15 AD3d 552, 553 [2005]; *Estate of Scheuer v City of New York*, 10 AD3d 272, 274-275 [2004]; *Booth v Huff*, 273 AD2d 576, 577 [2000]; *Lott v State of New York*, 32 Misc 2d 296, 297-298 [1962]). The right of sepulcher is deeply rooted in many religious traditions (*see Melfi v Mount Sinai Hosp.*, 64 AD3d at 32-36), and it extends to the next of kin's right to the receipt and possession of all of a decedent's remains (*see e.g. Estate of Scheuer v City of New York*, 10 AD3d at 274-275). A claim based on a violation of the right is designed to compensate the next of kin for the emotional suffering and mental anguish which they experience from the interference with their ability to properly bury their decedent (*see Melfi v Mount Sinai Hosp.*, 64 AD3d at 32, 36-37; *Bambrick v Booth Mem. Med. Ctr.*, 190 AD2d at 647). The likelihood of emotional injury is deemed so inherently genuine in such cases that neither proof of the plaintiffs' accompanying physical harm nor of a specific medical diagnosis and course of treatment is essential to a successful prosecution of the claim (*see Johnson v State of New York*, 37 NY2d 378, 381-382 [1975]; *Plunkett v NYU Downtown Hosp.*, 21 AD3d 1022, 1023 [2005]).

■ Accordingly, while the medical examiner has the statutory authority to exercise his or her discretion to perform an autopsy in certain cases, and to remove and retain bodily organs for further examination and testing in connection therewith, he or she also has the mandated obligation, pursuant to Public Health Law § 4215 (1) and the next of kin's common-law right of sepulcher, to turn over the decedent's remains to the next of kin for preservation and proper burial once the legitimate purposes for the retention of those remains have been fulfilled. This latter duty is not only ministerial in nature (*see Tango v Tulevech,* 61 NY2d 34, 40 [1983]), but is clearly for the benefit of, and is owed directly to, the next of kin. Furthermore, it may be satisfied in the present context by the simple act of notifying the next of kin that, while the body is available for burial, one or more organs have been removed for further examination. In this manner, the next of kin may make an informed decision regarding whether to bury the body promptly without the missing organs and then either accept the organs at a later date or authorize the medical examiner to dispose of them, or alternatively, to wait until such time as the organs and body can be returned to them together, in as complete a condition as is reasonably possible, for burial or other appropriate disposition by the next of kin. This requirement, hardly onerous in nature, strikes an appropriate balance between the fulfillment of the legitimate scientific and investigative duties of the Medical Examiner's Office and the recognition of the long-established rights of next of kin to receive and provide final repose to the remains of their loved ones.

We acknowledge that a majority of the Supreme Court of Ohio has reached a contrary conclusion under similar facts upon its application of the distinct statutory and decisional law of that jurisdiction (*see Albrecht v Treon,* 118 Ohio St 3d 348, 889 NE2d 120 [2008]). Mindful of that decision, we decline to follow it, since it was premised upon a due process analysis of the next of kin's alleged property interest in a decedent's bodily organs rather than upon the right of sepulcher. Moreover, the Ohio statutory scheme discussed in that case made no provision for the return of such organs to the next of kin and, indeed, was subsequently amended to expressly require that the coroner dispose of such organs as medical waste.

In the case before us, the plaintiffs, Jesse's next of kin, have alleged that at the time the medical examiner made their son's body available to them for burial, they were not advised that

the brain had been removed and retained for further examination. They have alleged further that, believing Jesse's body to be whole, they arranged for the wake, religious funeral services, and interment of their son's remains, only to learn two months later and quite by accident that Jesse's entire brain, the organ in which the very essence of their son had reposed, was still awaiting further examination in the mortuary. The fact that the organ in question was Jesse's brain serves to make these allegations most compelling, since,

> "[i]n the end, this case is not about a random piece of human tissue. It is about the decedent's brain . . . The brain was the source of the deceased's every thought, aspiration, dream, fear, laugh, memory, or emotion; it was the origin of every word spoken, every song sung, every joke told; everything a family member loved about the deceased could be traced back to it. If the next of kin have any right to the decedent's body, the right must include the brain" (*Albrecht v Treon*, 118 Ohio St 3d at 365, 889 NE2d at 134 [dissenting op]).

Additionally, the plaintiffs alleged that, due to the medical examiner's initial failure to advise them that Jesse's brain had been retained, they were required to endure a second funeral service, reliving all of the grief, emotional pain, and mental anguish which accompany such an event. We conclude, in light of the foregoing discussion, that to the extent the complaint is based on allegations that the medical examiner returned Jesse's body to the plaintiffs but failed to notify them of the retention of their son's brain, it states a cause of action to recover for the violation of the right of sepulcher. Accordingly, the Supreme Court properly denied the defendants' motion for summary judgment to that extent.

■ Finally, we note that while the sole remaining cause of action in the complaint additionally alleges that Jesse's brain was mishandled by being placed on public display by the medical examiner, the defendants submitted evidence clearly demonstrating that the organ was simply kept in a cabinet with other specimens awaiting further examination and was never publicly displayed in the manner alleged. Since the plaintiffs failed to raise a triable issue of fact in opposition to the defendants' prima facie showing in this regard, the plaintiffs are precluded from pursuing this theory of liability at trial.

Accordingly, the order is modified, on the law, by deleting the provision thereof denying that branch of the defendants' motion

which was for summary judgment dismissing so much of the first cause of action asserted by the plaintiffs Andre Shipley and Korisha Shipley as was to recover damages for unauthorized withholding, mutilation, and "display of their son's body parts at the Medical Examiner's Office," and substituting therefor a provision granting that branch of the motion; as so modified, the order is affirmed insofar as appealed from.

FLORIO, BELEN and ROMAN, JJ., concur.

Ordered that the order is modified, on the law, by deleting the provision thereof denying that branch of the defendants' motion which was for summary judgment dismissing so much of the first cause of action asserted by the plaintiffs Andre Shipley and Korisha Shipley as was to recover damages for unauthorized withholding, mutilation, and "display of their son's body parts at the Medical Examiner's Office," and substituting therefor a provision granting that branch of the motion; as so modified, the order is affirmed insofar as appealed from, without costs or disbursements.