This opinion is uncorrected and subject to revision before
publication in the New York Reports.
--------------------------------------------------------------------

No. 96
Andre Shipley et al.,
            Respondents,
         v.
City of New York et al.,
            Appellants.

            Ronald E. Sternberg, for appellants.
            Marvin Ben-Aron, for respondents.
            National Association of Medical Examiners, amicus
curiae.

PIGOTT, J.:

            At issue on this appeal is whether a medical examiner

has a mandated obligation -- pursuant to the New York Public

Health Law and a next of kin's common-law right to immediate

possession of a decedent's body for preservation and burial

(commonly known as the "right of sepulcher") -- to notify a

- 1 -

decedent's next of kin that, although a decedent's body is available for burial, one or more organs and/or tissues have been retained for further examination and testing as part of an authorized autopsy.  We hold that no such obligation exists.

I.

The tragic and unfortunate events from which this litigation originated occurred on January 9, 2005, when the decedent Jesse Shipley, a 17-year-old high school student, was killed in an automobile accident in Staten Island, New York.  Dr. Stephen de Roux, a forensic pathologist and a medical examiner employed by the Office of the New York City Medical Examiner, conducted an autopsy of decedent the day following the accident at the Richmond County Mortuary.

The medical examiner spoke with decedent's father, plaintiff Andre Shipley, prior to conducting the autopsy.  He apprised Mr. Shipley of his intentions and, even though it was not required, obtained Mr. Shipley's consent to perform the autopsy.  Mr. Shipley asked the medical examiner to make decedent's body as "presentable as possible" for the funeral.  During the autopsy, the medical examiner removed, among other organs, decedent's brain and "fixed" it in formalin[1] in a jar

---

[1]  In the amicus curiae brief submitted to this Court, the National Association of Medical Examiners explains that fixation in formalin fluid for two weeks allows a medical examiner to properly analyze brain tissues.  The fixation process, along with the subsequent neuropathological examination, routinely extends beyond the body being released to a funeral home after autopsy.

separate from tissue samples he had taken of other organs.[2]  The

jar was labeled with decedent's name and the date of the autopsy,

and was placed in a cabinet in the autopsy room.  The medical

examiner's routine practice was to wait until the cabinet had

accumulated at least six specimens before contacting a

neuropathologist, Dr. Hernando Mena, who would at that point

travel to Staten Island in order to conduct a neuropathologic

examination of the brain specimens.

Once decedent's autopsy had been conducted, funeral

home personnel retrieved decedent's body from the mortuary and a

funeral was held on January 13, 2005.

In March 2005, forensic science students from

decedent's high school took a field trip to the Richmond County

Mortuary.  During a tour of the autopsy room, some of the

students observed the specimen jar holding decedent's brain.

This information was relayed to decedent's sister, Shannon, who

told her parents.  On March 9, 2005, Dr. Mena examined the

specimen and concluded that decedent had died of multiple blunt

---

[2] The medical examiner explained at his deposition that he removed blood, bile, gastric contents, liver and vitreous humor from decedent's body and sent them to the toxicology lab.  He also took samples from certain organs and placed the pieces in a histology stock jar.  This ensured that the medical examiner could microscopically examine those tissues after the body's burial.  The medical examiner typically retains these samples for approximately three years.  The organs and tissues not retained by the medical examiner are typically placed in a red "biohazard" bag, which is then placed inside the body before the incision is sewn up.

trauma to the head.

II.

The Shipleys[3] commenced this action against the City of New York and the Office of the New York City Medical Examiner (collectively, the City), alleging negligent infliction of emotional distress resulting from the display and alleged mishandling and withholding of their son's brain.  Following discovery, the City moved for summary judgment dismissing the complaint for failure to state a cause of action, arguing that, based on the complaint's language, the Shipleys were asserting that the City interfered with the Shipleys' common-law right of sepulcher.  The City argued that the medical examiner had the authority to conduct the autopsy, had received the consent of Mr. Shipley to do so in any event, and that the removal and retention of the brain by the medical examiner was authorized by law.  The Shipleys countered that even assuming the medical examiner had the authority to conduct the autopsy, he had "mishandled" decedent's organs and "unlawfully interfered" with the Shipleys' right to decedent's "whole body."

Supreme Court denied the City's motion, holding that the City failed to establish as a matter of law that decedent's brain was lawfully retained for scientific purposes and that a

_____

[3] Although Shannon is listed as a plaintiff on the complaint, she was dismissed from the action on the ground of lack of standing.  Therefore, use of the name "Shipleys" will refer to plaintiffs Andre and Korisha Shipley.

question of fact existed as to whether the City interfered with
the Shipleys' right of sepulcher when it failed to apprise the
Shipleys before their son's burial that his brain had been
removed and was in the possession of the medical examiner (2009
WL 7401469, 2009 NY Misc LEXIS 6586 [Sup Ct, Richmond County
2009]).

The Appellate Division modified by deleting the
provision of Supreme Court's order denying the City's motion for
summary judgment seeking dismissal of so much of plaintiffs'
first cause of action as was to recover damages for unauthorized
withholding, mutilation, and display of decedent's body parts,
and granting that branch of the motion, and, as so modified,
affirmed (80 AD3d 171, 180 [2d Dept 2010]).

As relevant here, the Appellate Division held that the
autopsy of decedent was authorized, even if Mr. Shipley had not
consented to it, because the medical examiner had the statutory
authority to exercise his discretion in performing the autopsy
and removing and retaining organs for further examination and
testing (see id. at 175-176).  Nonetheless, according to the
Appellate Division, the medical examiner had "the mandated
obligation, pursuant to Public Health Law § 4215 (1) and the next
of kin's common-law right of sepulcher, to turn over the
decedent's remains to the next of kin for preservation and proper
burial once the legitimate purposes for the retention of those
remains [had] been fulfilled" (id. at 178).  The court deemed

this obligation to be not only "ministerial in nature" but also one that was "clearly for the benefit of, and . . . owed directly to, the next of kin," and this obligation could have been met with "the simple act of notifying the next of kin that, while the body [was] available for burial, one or more organs [had] been removed for further examination" (id.).  In the Appellate Division's view, such notification would have given the Shipleys an opportunity "to make an informed decision regarding whether to bury the body promptly without the missing organs and then either accept the organs at a later date or authorize the medical examiner to dispose of them, or alternatively, to wait until such time as the organs and body can be returned to them together . . . for burial or other appropriate disposition by the next of kin" (id.).

The case thereafter proceeded to trial on the sole issue of whether the medical examiner returned decedent's body to the Shipleys without informing them that the medical examiner had retained decedent's brain (and therefore violated the Shipleys' right of sepulcher).[4]  The City called one witness, Dr. de Roux, who testified that the brain was the only organ that was removed for neuropathologic examination by Dr. Mena, but that he had

_____

[4] The Appellate Division held that the Shipleys failed to raise a triable issue of fact in response to the City's prima facie showing that decedent's brain was not mishandled or put on "public display," and precluded the Shipleys from pursuing those theories of liability at trial (80 AD3d at 179).

obtained small samples of other organs and placed them in formalin.  He retained the latter organ samples so that they could be microscopically examined at a later date in the event a question arose as to decedent's cause of death.

At the conclusion of the defense's case, the Shipleys moved for a directed verdict on the issue of liability, relying on the medical examiner's testimony that the Shipleys were never informed that the medical examiner had retained decedent's brain and other organs.  The City also moved for a directed verdict, arguing, among other things, that there was insufficient evidence to establish a special relationship with regard to the right of sepulcher claim.  Supreme Court granted the Shipleys' motion for a directed verdict as to liability.

Following a trial on damages, resulting in a verdict of $1 million for the Shipleys, the City's motion to set aside the verdict was denied.  The Appellate Division affirmed the judgment entered upon the Shipleys' stipulation to a reduced award of damages (105 AD3d 936, 936-937 [2nd Dept 2013]).  The Shipleys consented to the reduced award.  This Court granted the City leave to appeal, bringing up for review the Appellate Division's order denying, in part, the City's motion for summary judgment.

III.

A medical examiner's authority to conduct autopsies is largely statutory.  Title II of article 42 of the Public Health Law identifies those individuals who possess the legal authority

to perform autopsy and dissection (see Public Health Law §§ 4209; 4210), and delineates criminal penalties for unlawful dissection (see Public Health Law § 4210-a) and civil penalties for unauthorized autopsies conducted in good faith (see Public Health Law § 4210-b). The Public Health Law also contains a religious exemption that prohibits a dissection or autopsy "in the absence of a compelling public necessity" where a "surviving relative or friend of the deceased" objects on the ground that the procedure is "contrary to the religious belief of the decedent" (Public Health Law § 4210-c).[5]

Public Health Law § 4210 provides that a county medical examiner, or one acting at his or her direction, has the right to dissect the body of a deceased person (see Public Health Law § 4210 [2] [c]). Additionally, New York City Charter § 557 (f) (1) states, as relevant here, that the chief medical examiner possesses "such powers and duties as may be provided by law in respect to the bodies of person[s] dying from criminal violence, by accident, by suicide, suddenly when in apparent health, when unattended by a physician, in a correctional facility or in any suspicious or unusual manner . . ." (emphasis supplied). Medical examiners possess the discretionary authority to determine when an autopsy is necessary, and, when indicated, "the autopsy shall include toxicologic, histologic, microbiologic and serologic

---

[5] The Shipleys did not raise a religious objection to the dissection or autopsy.

examinations" (Administrative Code of City of NY § 17-203).  The
statutory authority of a medical examiner to conduct dissection
and autopsy is, therefore, fairly broad, as is the right of the
medical examiner to remove and retain an organ, like the brain,
for further examination and testing (see id. at § 557 [f] [3]
[permitting the chief medical examiner to conduct "forensic and
related testing and analysis" and perform "pathology, histology
and toxicology testing and analysis" along with "determining the
cause or manner of injuries and/or death"]).

The medical examiner clearly had the authority to
conduct the autopsy in this instance.  As a public employee
engaging in a governmental function, his determination to conduct
the autopsy and his decision to remove the brain and other organs
for further study constituted "discretionary acts," meaning that
his conduct involved the "'exercise of reasoned judgment'" that
"may not result in the [City's] liability even [if] the conduct
[was] negligent" (Valdez v City of New York, 18 NY3d 69, 76
[2011], quoting Lauer v City of New York, 95 NY2d 95, 99 [2000]).
The pertinent issue in this appeal, however, is whether, in the
exercise of his statutory duties and obligations, the medical
examiner nevertheless had a common-law and statutory duty to
notify the Shipleys of his retention of certain organs and
tissues, and therefore violated the Shipleys' common-law right of
sepulcher and the Public Health Law when he failed to do so.

IV.

The common-law right of sepulcher affords the
deceased's next of kin an "absolute right to the immediate
possession of a decedent's body for preservation and burial, and
damages may be awarded against any person who interferes with
that right or improperly deals with the decedent's body" (Mack v
Brown, 82 AD3d 133, 137 [2d Dept 2011] [citations omitted]; see
Darcy v Presbyterian Hosp., 202 NY 259, 263 [1911], rearg denied
203 NY 547 [1911] [recognizing a cause of action for interference
and prevention of next of kin's right to receive the body of the
deceased]; Shepherd v Whitestar Dev. Corp., 113 AD3d 1078, 1080
[4th Dept 2014]; Melfi v Mt. Sinai Hosp., 64 AD3d 26, 31 [1st
Dept 2009]; LaMore v Sumner, 46 AD3d 1262, 1264 [3d Dept 2007]).
The right itself "is less a quasi-property right and more the
legal right of the surviving next of kin to find 'solace and
comfort' in the ritual of burial" (Melfi, 64 AD3d at 32).
Damages are limited to the emotional suffering, mental anguish
and psychological injuries and physical consequences thereof
experienced by the next of kin as a result of the interference
with the right of sepulcher (see id. at 32, 36-37; see also PJI
3:6.1).

Decedent's body was returned to the Shipleys once the
authorized autopsy had been conducted.  The body was thus made
available to the Shipleys for preservation and burial.  Because
the right of sepulcher is premised on the next of kin's right to
possess the body for preservation and burial (or other proper

disposition), and is geared toward affording the next of kin solace and comfort in the ritual of burying or otherwise properly disposing of the body, it is the <u>act of depriving the next of kin of the body</u>, and not the deprivation of organ or tissue samples within the body, that constitutes a violation of the right of sepulcher.[6]

To be sure, a cause of action for violation of the right of sepulcher will lie where there has been an "unauthorized autopsy" (<u>Darcy</u>, 202 NY at 265), which the courts of this state consider an "unlawful mutilation" (<u>Grawunder v Beth Israel Hosp. Assn.</u>, 242 AD 56, 60-61 [2d Dept 1934], <u>affd</u> 266 NY 605, 606 [1935]). However, the autopsy in this instance, as conceded by

_____

[6] The dissent's reliance on <u>Hendriksen v Roosevelt Hosp.</u> (297 F Supp 1142 [SD NY 1969]) for the proposition that the deceased's next of kin must first consent to a medical examiner's retention of parts of the body is misplaced. In <u>Hendriksen</u>, the defendant hospital and its physician did not possess the legal authority to conduct an autopsy in the first instance, and, therefore, they obtained written consent from the decedent's next of kin. That consent provided that "'[p]ermission is hereby granted for a complete autopsy to include examination (by scalp incision) of the central nervous system,'" which the plaintiff executed for the purpose of ascertaining the cause of death (<u>id.</u> at 1143-1144). The only issue in <u>Hendriksen</u> was whether the defendants' retention of decedent's internal organs and viscera exceeded the scope of the written consent. Although the <u>Hendriksen</u> court relied on <u>Hassard v Lehane</u> (143 AD 424 [1st Dept 1911]) for the (erroneous) proposition <u>Hassard</u> "established" that consent was necessary for "the retention of parts of the body" (<u>Hendriksen</u>, 297 F Supp at 1144), a closer examination reveals that <u>Hassard</u> was nothing more than a wrongful autopsy case (<u>see</u> <u>Hassard</u>, 143 AD at 425-426). As such, the <u>Hassard</u> court's statement -- unsupported by any authority -- that "even if the autopsy had been authorized . . ., that did not . . . justify the removal and detention of any of the organs of the decedent" (<u>id.</u> at 426), is plainly dicta.

the Shipleys, was plainly authorized.  Indeed, there is nothing in our common law jurisprudence that mandated that the medical examiner do anything more than produce the decedent's body for a proper disposition.  Thus, the only way there could be a violation of the Shipleys' right of sepulcher would be if the common law directed the medical examiner to produce not only decedent's body for proper disposition once the authorized autopsy was conducted, but the organs and tissue samples as well.

The Shipleys claim that, notwithstanding the medical examiner's statutory authorization to conduct autopsies and retain organs for examination and testing, both the common-law right of sepulcher and Public Health Law § 4215 (1) require that the brain and tissue samples removed during the autopsy be returned to a decedent's next of kin and only they, the next of kin, may direct the manner of their disposition.  Public Health Law § 4215 (1) states that:

> "[i]n all cases in which a dissection has been made, the provisions of this article [42, entitled "Cadavers"], requiring the burial or other lawful disposition of a body of a deceased person, and the provisions of law providing for the punishment of interference with or injuries to it, <u>apply equally to the remains of the body after dissection as soon as the lawful purposes of such dissection have been accomplished</u>" (emphasis supplied).

The Appellate Division held that the medical examiner had a "mandatory obligation" and "ministerial" duty pursuant to the common-law right of sepulcher and Public Health Law § 4215 (1) to turn over to the Shipleys the organs that he removed from

decedent, once he had completed the dissection and "the legitimate purposes of the retention of those remains [had] been fulfilled" (80 AD3d at 178).  This was error that broadly expanded the medical examiner's obligations under common law and statute.

We have explained that "ministerial acts -- meaning conduct requiring adherence to a governing rule, with a compulsory result -- may subject the municipal employer to liability for negligence" (Lauer, 95 NY2d at 99, citing Tango v Tulevech, 61 NY2d 34, 40-41 [1983] [liability will be imposed if the ministerial action is "otherwise tortious and not justifiable pursuant to statutory command"]).  Indeed, section 4215 (1) contains a "governing rule" or "statutory command" to the extent that the medical examiner, once he or she is finished with the authorized dissection, must turn the "remains of the body after dissection" over for "burial or other lawful disposition."  The issue thus boils down to whether the statutory language "remains of the body" refers to what is left of the body after the autopsy has been conducted (as the City argues), or requires the medical examiner to turn over not only the body itself but also any organs or tissue samples that have been removed during the autopsy (as the Shipleys contend).

That there is ambiguity concerning the statutory language "remains of the body," which is not a defined term, necessarily means that although the Legislature has provided the medical examiner with a "governing rule" and "statutory command"

to turn over a decedent's body for burial or proper disposition,
it has not issued such a rule or command directing the medical
examiner to turn over the organs and tissue samples recovered as
a result of a dissection or autopsy.[7]  Had the Legislature so
intended, rather than utilizing the phrase "remains of the body,"
it could have utilized the specific words "tissue, organ or part
thereof" as it has done in other sections of article 42 of the
Public Health Law (see Public Health Law §§ 4216 [making it a
class D felony for a person to remove from a dead body "any
tissue, organ or part thereof"]; 4217 [making it a misdemeanor
for a person to purchase or receive "any tissue, organ or part"

---

[7]  The dissent asserts that Public Health Law § 4215 (2)'s
statement that, where an autopsy or dissection has been made on
an "unclaimed body[,] . . . the persons having possession of the
body may, in their discretion, cause it to be either buried or
cremated, or may retain parts of such body for scientific
purposes," necessarily means that "parts of such body" is a
subset of "remains of the body" such that "remains of the body"
must mean more than the cadaver itself (dissenting op, at 13-14).
Section 4215 (2), however, provides more interpretive evidence
that, had the Legislature intended for "remains of the body" to
include something more than the cadaver itself, it knew how to do
so.  Indeed, the Public Health Law provides guidance concerning
the delivery and disposal of unclaimed bodies (see Public Health
Law §§ 4211 [Cadavers; unclaimed; delivery to schools for study];
4212 [Cadavers; unclaimed; delivery to schools; procedure]; 4214
[2] ["In the case of an unclaimed body of a deceased person, the
medical colleges, schools, institutes and universities shall have
a priority claim to the said body, for the purposes of medical,
anatomical or surgical science and study as provided in this
article"]; 4215 [2]).  Plainly, the use of the language "parts of
such body for scientific purposes" in section 4215 (2) is
intended to protect certain institutions from criminal penalties
for unlawful autopsy and dissection.  It does not follow, as the
dissent argues, that the use of the term "parts of such body" is
meant as a limitation on a medical examiner's authority to retain
organs and tissues.

of a dead body]; 4218 [making it a class D felony for a person to open a grave or other place of internment "with intent to remove the body, or any tissue, organ or part thereof, for the purpose of selling it or demanding money for the same, of for the purposes of dissection . . ."]).

The Legislature did not include such language in section 4215 (1).  If anything, the Public Health Law's designation of "tissues, organs, and body parts . . ., body fluids that are removed during . . . autopsy" as "regulated medical waste" (Public Health Law § 1389-aa [1] [b]), which must be stored, contained and treated or disposed of in a particular manner (see Public Health Law §§ 1389-cc; 1389-dd), only underscores that the medical examiner did not have a ministerial duty to turn over such organs and tissue samples as a matter of course.  Absent any specific legislative command that he do so, it was within the medical examiner's discretion to determine (a) what organs and tissue samples to retain; and (b) whether to apprise the Shipleys that decedent's body had been returned without the specimens.

The enactment of article 42 of the Public Health Law constituted legislative acknowledgment that certain governmental and non-governmental actors, such as coroners, medical examiners, and hospital and mortuary personnel, may, in certain circumstances, need to conduct dissections for a myriad of

reasons.[8]  In such situations, the "immediate" possession of the deceased's body by the next of kin is necessarily delayed.  This is evidenced by Public Health Law § 4200's directive that "every body of a deceased person, within this state, shall be decently buried or incinerated within a reasonable time after death," unless "a right to dissect it is expressly conferred by law" (Public Health Law § 4200 [1] [emphasis suppled]).  And, of course, the right of certain individuals to dissect and conduct autopsies is "expressly conferred by law."

When the Legislature enacted statutes granting medical examiners (and others) the authority to conduct autopsies and dissections (see Public Health Law §§ 4209; 4210), it acknowledged through the enactment of section 4215 (1) that there would be situations where the decedent's body may not be buried or incinerated within a reasonable time after the decedent's death, as per section 4200 (1)'s directive.  Thus, section 4215 strikes a balance permitting the lawful dissection of a body, while concomitantly ensuring that once the lawful purposes have been accomplished the body will be buried, incinerated or properly disposed of as per section 4200 (1), and that the penalties for the interference or injuries to the body would "apply equally to the remains of the body after dissection . . ."

When section 4200 (1) and section 4215 (1) are read in

---

[8] For instance, autopsies and hygienic maintenance of the deceased's body in preparation for disposition.

tandem, there is no language that would cause a medical examiner to divine from section 4215 (1) that he or she is required to return not only decedent's body, but the organs and tissue samples that the medical examiner is legally permitted to remove. Similarly, our right of sepulcher jurisprudence does not mandate that a medical examiner return decedent's organs and tissue samples. Thus, because there was no governing rule or statutory command requiring a medical examiner to turn over organs and tissue samples, it could not be said that he or she has a ministerial duty to do so. At most, a medical examiner's determination to return only the body without notice that organs and tissue samples are being retained is discretionary, and, therefore, no tort liability can be imposed for either the violation of the common-law right of sepulcher or Public Health Law § 4215 (1). Once a medical examiner returns a decedent's body sans the organs and tissue samples, the medical examiner for all intents and purposes has complied with the ministerial duty under section 4215 (1). Absent a duty to turn over organs and tissue samples, it cannot be said that the medical examiner has a legal duty to inform the next of kin that organs and tissue samples have been retained.

The events that precipitated this litigation were tragic and unfortunate. But, absent any specific rule requiring the medical examiner to turn over the removed organs and tissue samples and/or notify the Shipleys that the brain and such tissue samples had been retained for further examination and testing,

liability cannot be imposed on the City for failing to abide by an alleged "ministerial" duty when there was no specific directive for a medical examiner to follow other than the mandatory obligation to return the body once finished with the lawful objectives of the examination.

V.

The issues raised on this appeal are of a sensitive nature. The Appellate Division attempted to craft a notification rule that it claimed would be "hardly onerous" for the medical examiner to follow, i.e., the "simple act of notifying the next of kin that, while the body is available for burial, one or more organs have been removed for further examination" and that they may be accepted at a later date for burial (80 AD3d at 178). But the claimed ease of that rule's application is irrelevant in the context of these matters because practical and policy considerations exist beyond merely providing next of kin with notification.

The Appellate Division's notification rule -- which the Office of the New York City Medical Examiner has followed (not out of its belief that it is appropriate but rather because it felt compelled by the Appellate Division to do so) -- presumes that all next of kin actually want to be notified. The Appellate Division's notification rule raises more questions than it answers, such as what type of notice is required; what the time period is for when such notice should be given; which organs, tissues and specimens must be turned over and how; and how long

should such organs, tissues and specimens be retained while the next of kin determine whether they wish to bury the body with those items.

Other jurisdictions have impliedly recognized the inherent problem with judicially-crafted notice rules and, after the commencement of litigation by next of kin asserting that they possessed a property interest in their decedents' organs (see Waeschle v Dragovic, 576 F3d 539, 545 [6th Cir 2009], cert den 559 US 1037 [2010]; Albrecht v Treon, 118 Ohio St3d 348, 350, 889 NE2d 120, 122 [2008]), enacted statutes that provide legislative guidance on a medical examiner's obligations concerning the return of a decedent's organs and tissues after a lawful autopsy has been conducted (see Mich Compiled Laws Ann § 52.205 [6] [requiring medical examiner to "promptly deliver or return the body or any portion of the body to relatives or representatives of the decedent," but allowing the medical examiner to "retain any portion of the body" that the medical examiner considers necessary; setting forth the notification and record-keeping procedures the medical examiner must follow "if a portion of the body retained is an entire organ or limb of the decedent," and also calling for the disposition of the unwanted organs or limbs as "medical waste"]; Ohio Rev Code Ann § 313.123[9] [defining

---

[9] These medical waste and religious exemption provisions are somewhat similar to ours (see Public Health Law §§ 1389-aa [1] [b] [medical waste]; 4210-c ["no dissection or autopsy shall be performed over the objection of a surviving relative or friend of the deceased that such procedure is contrary to the religious

"retained tissues, organs, blood, other bodily fluids, gases and other specimens from autopsy" as "medical waste" and requiring their disposal in accordance with state and federal law, but providing for a religious exemption that prohibits the coroner from removing those specimens unless such removal "is a compelling public necessity," and, in such case, the coroner must "return the specimens, as soon as is practicable, to the person who has the right to the disposition of the body," unless the specimen is a DNA specimen]).

## VI.

There is simply no legal directive that requires a medical examiner to return organs or tissue samples derived from a lawful autopsy and retained by the medical examiner after such an autopsy. The medical examiner's obligations under both the common-law right of sepulcher and Public Health § 4215 (1) are fulfilled upon returning the deceased's body to the next of kin after a lawful autopsy has been conducted. If the Legislature believes that next of kin are entitled to notification that organs, tissues and other specimens have been removed from the body, and that they are also entitled their return prior to burial of the body or other disposition, it should enact legislation delineating the medical examiner's obligations in that regard, as it is the Legislature that is in the best

believe of the decedent," unless compelling public necessity can be demonstrated]).

position to examine the issue and craft legislation that will
consider the rights of families and next of kin while
concomitantly taking into account the medical examiner's
statutory obligations to conduct autopsies.

Accordingly, the order insofar appealed from should be
reversed, with costs, and the complaint dismissed in its
entirety.

Andre Shipley et al. v. City of New York, et al.

No. 96

RIVERA, J.(dissenting):

The underlying facts leading to this appeal are horrific, and although specific to the parties, they remind us of the grief experienced upon the passing of a family member and the urgent desire of the living to provide final repose to the dead. Throughout history, individuals from different cultures and communities have performed funeral rites, based on personal beliefs and religious customs, intended to send the deceased to a final resting place. This most human of acts has been repeated over the centuries in myriad and unique ways, and within our legal system the common law has recognized the next of kin's right to possession of the body for preservation and burial, known as the right of sepulcher.

This appeal requires the Court to consider this ancient right in the context of the defendants' statutory authority to conduct an autopsy on the body of the deceased. Resolution of the issues raised by the parties must be based on applicable common and statutory laws, which embody New York State's long-established "[r]espect for the dead, [and] the feelings of [human beings] for their deceased parents, relatives and friends" (Finley v Atlantic Transp. Co. Ltd., 220 NY 249, 255 [1917]). In

- 1 -

accordance with the plaintiffs' right of sepulcher and the mandates of the Public Health Law, I would hold that defendants' statutory authority to conduct an autopsy does not permit a medical examiner to retain organs once the lawful purpose for their retention has been accomplished, absent notification to, and consent from the next of kin.  Therefore, I disagree with the majority's conclusion that a medical examiner has unfettered discretion to retain organs once they no longer serve any legitimate purpose, and also to withhold information from the next of kin that parts of the body are unavailable immediately for burial, or are never to be returned.  I therefore dissent.

I.

Plaintiffs Andre and Korisha Shipley lost their only son, 17-year-old Jesse Shipley, while he was a passenger in a car involved in a motor vehicle accident in Staten Island.  During the course of Jesse's autopsy, the forensic pathologist and Richmond County's then-Acting Deputy Chief Medical Examiner removed and took tissue samples from various organs, including the heart, liver, and kidney, and then reinserted those organs into the body.

The medical examiner also removed and retained Jesse's entire brain for future examination by another doctor.  According to the medical examiner it was his Office's standard practice to preserve the brain in formaldehyde and then wait until

approximately six more specimens were ready before requesting that the doctor travel to Staten Island to conduct the neuropathological study of the brains.  The medical examiner explained that "it doesn't make sense" for the doctor "to come and do one."

The medical examiner completed the autopsy within 24 hours of Jesse's death, and the body was transferred to the funeral home the following day, whereupon the family held funeral services and buried their son three days later.  It is undisputed that the medical examiner did not notify the plaintiffs before the autopsy or in advance of the burial that their son's brain had been removed and retained for future study.

Plaintiffs alleged that they first learned about the retention of Jesse's brain two months after the burial, under apparent gruesome circumstances.  According to plaintiffs, they learned from their daughter that during a field trip to the Medical Examiner's Office several students and a teacher from Jesse's high school saw what they believed to be a brain and other body parts on display in a jar labeled with Jesse's name and the words "as a result of drunk driving."  The students had an emotional reaction to seeing the jar and its contents, and as a result the teacher immediately cancelled the trip and left with the students.

After plaintiffs confirmed that Jesse's brain had been removed and retained, they spoke with their priest, who informed

them that their son's burial was not proper without the remaining body parts.  In response to the plaintiffs' request, the Medical Examiner's Office returned the brain and the retained samples of several other organs to the family. Plaintiffs then conducted a second funeral and burial service for their son, months following the first.

Plaintiffs thereafter commenced this action against the City of New York and the Office of the New York City Medical Examiner, asserting, inter alia, damages for costs and emotional injuries due to the defendants' violation of plaintiffs' right of sepulcher.  The majority rejects what had proved successful arguments in support of the plaintiffs' claims in the courts below, but does so by misreading defendants' statutory authority to retain organs during the course of Jesse's autopsy.


II.

Under New York's common-law right of sepulcher, the next of kin has the absolute right to the immediate possession of a decedent's body for preservation and burial (Darcy v Presbyt. Hosp. in City of New York, 202 NY 259 [1911]; Finley, 220 NY 249; Estate of Scheuer v City of New York, 10 AD3d 272 [1st Dept 2004], lv denied 6 NY3d 708 [2006]).  The concept of a family's right to burial, recognized by diverse cultures and religious faiths, is age-old and serves an important role in the complexity of human existence.  As one court has described it,

> "[t]he right of sepulcher, evoking the
> mystery and sorrow of death and the hope for
> an afterlife, has been ritualized since the
> earliest pre-Christian civilizations. From
> the Egyptian mummification process to the
> Roman civil law's imposition of a duty of
> burial, virtually every faith and society has
> exhibited a reverence for the dead"

(Melfi v Mount Sinai Hosp., 64 AD3d 26, 32 [1st Dept 2009]).

The duty associated with disposition of the body concerns "the

legal right of the surviving next of kin to find 'solace and

comfort' in the ritual of burial" (id., 64 AD3d at 32; see also

Finley, 220 NY at 257 [recognizing unauthorized burial at sea

"depriv(ed) the next of kin of the solace of giving the body a

decent burial"], and Stahl v William Necker, Inc., 184 AD 85,

90-91 [1st Dept 1918]["[n]ext of kin have the right to the

possession for the purpose of burial or other disposition which

they may see fit to make of the body of a deceased relative"]).

It is now well-settled that violation of the next of

kin's right to burial is compensable.  One of the earliest and

clearest articulations of such a claim appears in Foley v Phelps

(1 AD 551 [1st Dept 1896]), wherein the court stated that

> " '[t]he right to bury a corpse, and to
> preserve its remains, is a legal right, which
> the courts of law will recognize and
> protect.' The right is to the possession of
> the corpse in the same condition it was in
> when death supervened.  It is the right to
> what remains when the breath leaves the body,
> and not merely to such a hacked, hewed and
> mutilated corpse as some stranger . . . may
> choose to turn over to an afflicted relative"

(id. at 555, quoting Brick Church Case, 4 Bradf. (Sur.) 532).

Then in 1911, in <u>Darcy v Presbyterian Hosp. in City of N.Y.</u>, this Court held that a surviving spouse could maintain a cause of action for "wounded feelings and mental distress" arising from the unlawful interference with her right to possession of her husband's body and the unauthorized dissection of his remains (202 NY at 263).  Just six years later, when this Court decided <u>Finley</u>, the courts had already recognized a right of action "for an unauthorized dissection or one contrary to the wishes or consent of the widow, heirs or next of kin . . . for retaining organs of a deceased body after autopsy or without consent . . . and for mutilation of a body" (220 NY at 257-258 [internal citations omitted]).  Against this legal backdrop, <u>Finley</u> made clear that the next of kin has "a legal right to the possession of the body for burial and any unlawful interference with that right [is] an actionable wrong" which "is a subject for compensation" (<u>id.</u> at 258).


                                III.

        The majority concludes that in accordance with the Public Health Law the medical examiner was under no duty to return for burial Jesse's removed body parts, or to notify plaintiffs of the removal and retention of Jesse's brain and other organ samples.  However, a careful reading of all the applicable statutes and rules reveals notable limitations on the medical examiner's authority to conduct an autopsy and retain the

remains of the body, and evinces an intention to ensure proper return of all body parts for burial purposes, subject only to the completion of a lawful dissection.

The Public Health Law provides that "[e]xcept in cases in which a right to dissect is expressly conferred by law, every body of a deceased person, within this state shall be decently buried or incinerated within a reasonable time after death" (Public Health Law § 4200 [1]).  Section 4215 (1) further states that where a dissection is performed,

> "the provisions of this article, requiring the burial or other lawful disposition of a body of a deceased person, and the provisions of law providing for the punishment of interference with or injuries to it, apply equally to the remains of the body after dissection as soon as the lawful purposes of such dissection have been accomplished."

By its plain language, the statute is protective of the next of kin's right of burial of the deceased's remains.

While the statute grants authority to conduct an autopsy, article 42 of the Public Health Law, upon which the majority and defendants' rely, "reflects . . . concerns for respecting the corporeal remains of decedents and protecting the feelings of family members by strictly limiting the circumstances under which autopsies may be performed" (Bambrick v Booth Mem. Med. Ctr., 190 AD2d 646, 647 [2d Dept 1993] [emphasis added]). Accordingly, autopsies only may be conducted by designated individuals for statutorily delineated purposes (see Public Health Law § 4209 [limiting the persons who may preform an

autopsy]; id. § 4210 [limiting the right to dissect the body of a deceased person]).  Thus, a medical examiner is authorized to dissect a deceased person under Public Health Law § 4210,[1] for example, in cases prescribed by special statutes, in the course of a criminal investigation, generally to determine the cause of death, or where a next of kin consents (see Public Health Law § 4210 [2]) [dissection is permitted by a coroner or medical examiner, "performed in the course of an investigation within the jurisdiction of the officer performing or directing the dissection, or . . . upon the written request of a district attorney, or sheriff, or the chief of a police department"]; id. § 4210 [3] [autopsy authorized by next of kin of the deceased]).

Moreover, under the New York City's local laws and rules the Chief Medical Examiner may perform an autopsy or dissection for those dying "from criminal violence, by accident, by suicide, suddenly when in apparent health, when unattended by a physician, in a correctional facility or in any suspicious or unusual manner" (New York City Charter § 557 [f] [1]; see also County Law § 673).  Significantly, no autopsy is conducted "if it may be concluded with reasonable certainty that death occurred from natural causes or obvious traumatic injury, and there are no other circumstances which would appear to require an autopsy" unless the medical examiner deems the autopsy necessary in

---

[1] Section 4210 (1) also authorizes coroners and coroner's physicians to conduct autopsies.

accordance with the law (Administrative Code of the City of New York § 17-203).[2]

As the laws authorizing an autopsy are in derogation of the common law right of sepulcher, they must be strictly construed (McKinney's Cons. Laws of N.Y., Book 1, Statutes § 301, Comment ["Statutes in derogation or in contravention of (the common law), are strictly construed, to the end that the common law system be changed only so far as required by the words of the act and the mischief to be remedied"]). Thus, notwithstanding the majority's suggestion to the contrary, a medical examiner does not have unlimited power to conduct an autopsy. Although a medical examiner exercises a certain amount of professional judgment in the course of performing a human dissection, the law does not permit professional conduct in excess of statutory authority. The question then is whether a medical examiner may retain organs or parts thereof, and, upon the next of kin's request, refuse to turn them over for burial and proper disposition once the autopsy is complete and such human material

---

[2] The Administrative Code of the City of New York authorizes investigation of deaths appearing to be caused by
> "(a) A violent death, whether by criminal violence, suicide or casualty;(b) A death caused by unlawful act or criminal neglect;(c) A death occurring in a suspicious, unusual or unexplained manner;(d) A death caused by suspected criminal abortion;(e) A death while unattended by a physician . . . (f) A death of a person confined in a public institution other than a hospital, infirmary or nursing home."

is no longer required for further study.

In a case presenting facts and claims similar to those presented by this appeal, the Southern District of New York, in Hendriksen v Roosevelt Hospital, refused to dismiss a right of sepulcher claim based on the alleged lack of consent by plaintiff to the removal and retention of organs during a lawful autopsy (297 F Supp 1142, 1143-1144 [1969], citing Hassard v Lehane 143 AD 424, 425 [1st Dept 1911] [recognizing claim for retention of organs]). In reaching its conclusion, the Southern District relied on the First Department's decision in Hassard v Lehane, which involved an unlawful autopsy, and the removal and retention of the decedent's organs. The First Department determined that the next of kin had a legal right to the possession of her son's corpse "in the condition it was in at the instant of death for the purpose of preserving and burying the remains" (143 AD at 425). It further opined that retention of the organs was unwarranted absent legal authority to do so (id. at 426).

The Southern District recognized in Hendriksen that the authority to conduct an autopsy is limited in accordance with the statute, and, to the extent organs are removed, there must be a lawful basis for their retention. Whether on consent of the next of kin or upon some other lawful authority, organ retention is not automatically permissible, or in fact intended, by the statute (Hendriksen, 297 F Supp at 1144-45; see also Dixon, 76 AD3d 1043 [same], decided with Shipley v City of New York, 80

AD3d 171).  Although the court's analysis in <u>Hendriksen</u> responded

to the issues in that case, the approach is just as applicable

and equally relevant to the issues raised by the current appeal:

> "We are not herein concerned with the mere
> removal of organs in the course of autopsy,
> or the taking of tissue samples in order to
> determine cause of death, but with the
> failure, as yet unexplained, to return those
> organs to the body and thereby restore its
> condition to the extent reasonably possible.
> The necessity of consent to the retention of
> parts of the body, even in the presence of
> consent to the autopsy itself, was
> established by <u>Hassard v. Lehane</u>, which
> stated: 'Doubtless if the defendant made the
> autopsy by the direction of the coroner, that
> would justify the dissection of the body . .
> . but it would not, in the absence of further
> directions from the coroner or district
> attorney, or other evidence, warrant the
> removal or detention of any part of the
> body' "

(297 F Supp at 1144 [internal citations omitted]).

Yet, despite the long-established right of sepulcher,

the Public Health Law's apparent recognition of the next of kin's

right to burial, the state and city laws' limits on the medical

examiner's authority to conduct an autopsy, and the case law

requiring the return of organs and body parts upon completion of

the autopsy and all necessary examinations, the majority

concludes that a medical examiner may retain organs and organ

specimens, even though such retention serves no statutory

purpose.  That conclusion depends, in my opinion, on a misreading

of Public Health Law § 4215 (1), and the erroneous premise that

the right of sepulcher includes only the dissected corpse.

Specifically, the majority adopts the City's interpretation that the phrase "remains of the body" contained in section 4215 (1) excludes organs removed during an autopsy (majority op at 13-14). In support of this conclusion, the majority relies on other sections of the Public Health Law, specifically sections that criminalize theft of tissues and organs, which make no reference to "remains of the body". That interpretation is a strained and decontextualized reading of the statute (see McKinney's Cons. Laws of N.Y., Book 1, Statutes § 97).

The Public Health Law makes no provision for the retention of organs upon completion of an autopsy, with one exception, found in section 4215 (2). That subparagraph refers to autopsy or dissection of an unclaimed body, and provides "that the persons having possession of the [unclaimed] body may, in their discretion, cause it to be either buried or cremated, or may retain parts of such body for scientific purposes." In accordance with this subparagraph, the person in possession of the unclaimed body may retain, for scientific purposes, "parts" rather than the whole of the body, upon completion of the autopsy or dissection. Consequently, "parts of such body" refers, by necessity, to a subset of the "remains of the body." Thus, "remains of the body" encompasses more than merely the cadaver without its organs, because otherwise the reference to "parts of such body" would be unnecessary.

Moreover, the limitation in subparagraph (2) that retention of "parts of such body" is permissible solely "for scientific purposes" provides additional support for reading "remains of the body" to include organs since organs are commonly used for scientific study.  This interpretation of "remains of the body" applies to the entirety of section 4215, and makes clear that the majority's reading of subparagraph (1) is textually unsupportable. (See McKinney's Cons. Laws of N.Y., Book 1, Statutes § 97, Comment ["The different parts of the same act, though contained in different sections, are to be construed together as if they were all in the same section, and the meaning of a single section may not be determined by splitting it up into several parts"]).

Furthermore, while article 42 of the Public Health Law does not define "parts of such body", article 43, which applies to anatomical gifts, specifically includes organs within its definition of "parts of the body" (Public Health Law § 4300 [5]). Therefore, it is not true, as the majority argues, that the legislature limits itself to use of the word "organ" when it means to include only the word "organ".  Rather, the legislature employs various terms throughout the Public Health Law when intending to refer to organs and "other portions of the human body" (see id.).

The majority's reliance on sections 4216, 4217, and 4218 of the Public Health Law does not support its interpretation

of section 4215 (1), because those sections impose criminal liability for uniquely targeted conduct and thus require a certain textual specificity.  Those sections -- respectively titled "Body stealing," "Receiving stolen body of a human being," and "Opening graves" -- criminalize what is best known as body snatching, trafficking in human body parts, and grave robbing.[3] The nature of these proscribed acts, generally for profit and focused less on the corpse as a whole than on the unlawful removal of more conveniently traded individual body parts, such as organs, explains the statutory reference to discrete, highly

---

[3] Section 4216, "Body stealing," provides "A person who removes the dead body of a human being, or any tissue, organ or part thereof from a grave, vault, or other place, where the same has been buried, or from a place where the same has been deposited while awaiting burial, without authority of law, with intent to sell the same, or for the purpose of dissection, or for the purpose of procuring a reward for the return of the same, or from malice or wantonness, is guilty of a class D felony."

Section 4217, "Receiving stolen body of a human being," states "A person who purchases, or receives except for the purpose of burial, the dead body of a human being, or any tissue, organ, or part thereof, knowing that the same has been removed contrary to section forty-two hundred sixteen of this title, is guilty of a misdemeanor."

Section 4218, "Opening graves," provides "A person who opens a grave or other place of interment, temporary or otherwise, or a building wherein the dead body of a human being is deposited while awaiting burial, without authority of law, with intent to remove the body, or any tissue, organ or part thereof, for the purpose of selling it or demanding money for the same, or for the purpose of dissection, or from malice or wantonness, or with intent to steal or remove the coffin or any part thereof, or anything attached thereto, or any vestment, or other article interred, or intended to be interred with the dead body, is guilty of a class D felony."

valued, body components.  Certainly there is no suggestion by any party to this appeal that these sections apply to a medical examiner's withholding of organs for purposes of an autopsy or legitimate examination.  Thus, these provisions cannot be read to mean that the phrase "remains of the body" as set forth in section 4215 (1) excludes an essential part of the body, i.e. organs.

As an additional matter, while our focus is on the interplay between the Public Health Law and the right of sepulcher, the defendants' litigation position regarding the medical examiner's authority to retain organs appears at odds with the City's health code.  Article 205 of the Code, "Deaths and Disposals of Human Remains," defines "human remains" as "a conceptus which has completed 24 weeks or more of gestation or all or any part of the dead body of a human being but does not include human ashes recovered after cremation" (New York City Health Code [24 RCNY] § 205.01 [c] [emphasis added]).  Given the broad scope of this definition, the phrase "any part of the dead body" must be accorded its natural meaning to include a deceased's organs.  Section 205.17, titled "Claiming of human remains removed to the City mortuary," further provides that "human remains which have been removed to the City mortuary" shall be delivered along with the death certificate "on demand, to a funeral director or undertaker," employed by, inter alia, the next of kin (id. § 205.17).  Of course, the medical examiner

is authorized to conduct an autopsy for a lawful purpose. (Administrative Code § 17-203). Thus, in New York City, "human remains" includes the decedent's organs and those organs must be returned upon demand by the funeral home, for proper disposition by the next of kin, once the lawful purpose for retention of the organs has been fulfilled.

Here, only after the medical examiner released the body for the first burial, and once the plaintiffs realized the brain had been removed and demanded it be turned over, did the medical examiner return Jesse's brain to plaintiffs. The question then is whether the defendants may be held liable for plaintiffs' emotional damages due to the medical examiner's failure to inform plaintiffs of the removal and retention of Jesse's brain prior to the first funeral service and burial.

IV.

"Government action, if discretionary, may not be a basis for liability, while ministerial actions may be, but only if they violate a special duty owed to the plaintiff, apart from any duty to the public in general" (McLean v City of New York, 12 NY3d 194, 203 [2009]). Under the common-law right of sepulcher, the Public Health Law, and City code, the medical examiner is without authority to retain organs once the lawful purpose for their removal and retention has been accomplished. Therefore, once the legitimate basis for withholding the organs has ended,

the medical examiner has a ministerial duty to turn over the organs to the next of kin upon demand or, where the next of kin does not seek return, to properly dispose of the organs.

In concluding that the medical examiner has no such ministerial duty, the majority relies on its interpretation of section 4215, and also points to Public Health Law § 1389-aa (1) (b), which includes organs and body parts removed during an autopsy within its definition of regulated medical waste (maj op at 14). For the reasons I have already described, section 4215 requires that the medical examiner return the organs, absent a legitimate purpose to retain them. With respect to the majority's reference to section 1389-aa (1) (b), the majority ignores the fact that, pursuant to his usual practice, the medical examiner here initially turned over all the organs along with the body, with the exception of Jesse's brain. The medical examiner testified that he removed all the organs in order to obtain samples for the autopsy and future study. He then, again in accordance with his usual practice, placed all of the organs into a bag, not including the brain, which he preserved for future examination. He put the bag into the body and stitched it up for pick up by the funeral home. As this testimony establishes, the fact that organs are removed from the body during an autopsy does not mean that the medical examiner cannot reinsert them for burial or that the statute prohibits return of the organs to next of kin. Indeed, defendants admit that

> "[t]he Medical Examiner, at the request of
> the next of kin, may, and does, as
> appropriate and as occurred in this case,
> return, for disposition by burial or
> cremation in accordance with the law, organs
> removed during an authorized autopsy once the
> legitimate purposes for the retention of
> those organs have been fulfilled."

Under these circumstances, the return of organs is ministerial, and, therefore, if a special duty to plaintiffs exists, injury caused by the failure to return or the negligent mishandling of those organs may be a basis for liability.

In Pelaez v Seide, this Court stated that

> "[a] special relationship can be formed in
> three ways: (1) when the municipality
> violates a statutory duty enacted for the
> benefit of a particular class of persons; (2)
> when it voluntarily assumes a duty that
> generates justifiable reliance by the person
> who benefits from the duty; or (3) when the
> municipality assumes positive direction and
> control in the face of a known, blatant and
> dangerous safety violation"

(2 NY3d 186, 199-200 [2004]).  Plaintiffs' action falls within the first category of special relationship cases because under section 4215 (1) of the Public Health Law the medical examiner is under a duty to return the body and its remains (see Public Health Law § 4215 [1]).  Such duty is clearly for the benefit of the next of kin who is, by law, authorized to bury and dispose of the body.

Plaintiffs' action also falls within the second category of special relationship cases because they relied on the defendants' assumption of the duty to conduct an autopsy as

required by law, which also mandated return of Jesse's organs once the legitimate purpose for their retention had been accomplished. To establish a special relationship by a duty voluntarily assumed, plaintiffs must show that there was:

> "(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking"

(Valdez v City of New York, 18 NY3d 69, 80 [2011]).

Here, the medical examiner took possession of the body, conducted an autopsy, and returned the body for purposes of burial by the next of kin. The medical examiner knew that the proper burial of the plaintiffs' son and the condition of the body were significant to the family as the father indicated the body should appear presentable for the funeral service. Moreover, the right of sepulcher itself recognizes the significance of this most difficult and consequential of actions, the proper and final disposition of the remaining corporeal remains of a loved one. The medical examiner surely understood that failure to return the body in order to comply with this most intimate and personal of familial obligations would result in harm to plaintiffs. Further, it is undisputed that there was contact between the medical examiner and plaintiff's father related to the autopsy and the burial. On these facts, plaintiffs

justifiably relied on the medical examiner's assumption of the duty to return the body, including the organs, for proper burial, thus establishing the basis for a special relationship between the City and plaintiffs.

However, because the next of kin may very well determine that a proper burial can be conducted without the organs, the Appellate Division properly concluded that the medical examiner may satisfy the duty to the next of kin by notification of the organs removal (see 80 AD3d at 178).  Upon such notice, the next of kin may then determine whether to request the return of the organs, and, if so, whether to delay burial and wait to learn if the medical examiner can, as a legal matter, comply with this request, or whether to proceed expeditiously with the disposition of the body.

The majority finds that because there is no duty to return organs, the medical examiner also has no duty to notify the next of kin that organs have been retained (maj op at 17). While I disagree that the medical examiner has no duty to return the organs, I agree that there is no statute mandating notification.  Nevertheless, that fact is of no moment because the right of sepulcher provides sufficient legal basis for imposing a notification requirement.  As this case makes abundantly clear, the right would be rendered meaningless if the next of kin did not know about the condition under which the body was returned.  In other words, notification ensures a fully

informed next of kin's exercise of the right of sepulcher.

The majority also raises what it considers to be the "practical and policy considerations" of providing notice to next of kin (maj op at 17). However, any such considerations must, of necessity, be addressed in the first instance by the defendants. In any event, the fact of the matter is, on this appeal, defendants have represented that they are in compliance with the Appellate Division's decision. That is to say, they provide some type of notice to next of kin, and upon request return the organs.

V.

The question remains open as to whether the majority's reading of the Public Health Law permits a demand for organs based on religious grounds, or whether there should be some notice concerning the legal rights of next of kin based on the decedent's religious beliefs. However, as the majority acknowledges (maj op at 7-8), section 4210-c provides for a religious exemption from an autopsy or dissection, and states specifically,

> "[n]otwithstanding any other provision of law, in the absence of a compelling public necessity, no dissection or autopsy shall be performed over the objection of a surviving relative or friend of the deceased that such procedure is contrary to the religious belief of the decedent, or, if there is otherwise reason to believe that a dissection or autopsy is contrary to the decedent's religious beliefs."

Notwithstanding the clear legislative intent to address religious concerns regarding dissection and autopsies, this case suggests the general public has little basis by which to understand the rights afforded under the statute.

According to the undisputed facts, the medical examiner made no inquiry of the plaintiffs about their possible objection to the autopsy on religious grounds.  However, plaintiffs' testimony suggests they did not know about the exemption even though religious concerns about the condition of their son's post-autopsy body informed their demand for their son's brain. Jesse's mother testified that she "wanted to confirm that his remains be with his body in consecrated grounds for resurrection purposes on judgement day."

Moreover, even though the statute refers to religious beliefs, and makes no distinction among religions or the types of faith-based objections to an autopsy, the medical examiner testified "that families can object, yes, based on certain religions.  Not all religions."[4]  Apparently, the medical

---

[4] The defendants' website identifies certain religions with the potential to raise "a viable religious objection" (Office of Chief Medical Examiner, Frequently Asked Questions, http://www.nyc.gov/html/ocme/html/faq/faq.shtml#6 ["[I]f we cannot fulfill our legal and public responsibility without performing an autopsy, if the family has raised a viable religious objection (i.e., based on Judaism, Islam, Christian Science, Jehovah's Witness, or 7th Day Adventist) they will be provided an opportunity to hire an attorney, if they desire, and to present their objection to a Judge who will determine whether an autopsy will be performed."]

examiner here based decisions concerning the religious exemption on the name of the decedent and the existence of some religious artifact or apparel, which suggested to him the decedent's religious affiliation.  This seems contrary to the language and purpose of section 4210-c and further supports the need for notification so that the next of kin are well-prepared to make fully informed choices.

The majority suggests that any change in the rights of the next of kin should come from the legislature.  That is indeed so because the majority has interpreted the law as applied to cases involving an autopsy in such a way as to deny the next of kin the right to demand return of their loved one in as undisturbed a condition as possible.  Perhaps the majority's ruling will result in greater awareness of the right of sepulcher.  Even so, for those who indeed know enough to seek the return of the deceased's organs, the majority provides no "solace and comfort," and little assurance, that their request will be honored by the medical examiner.  Therefore, I dissent.

*    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

Order, insofar as appealed from, reversed, with costs, and the complaint dismissed in its entirety.  Opinion by Judge Pigott. Judges Read, Abdus-Salaam, Stein and Fahey concur.  Judge Rivera dissents in an opinion in which Chief Judge Lippman concurs.

Decided June 10, 2015